**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| DUSTIN LEE STAGGERS,<br><br>Calle Cholula 52, Interior 400<br>Colonia Hipodrómo<br>Alcaldía Cuauuhtémo<br>CDMX, CP 06100<br>MEXICO<br><br>Petitioner,<br><br>v.<br><br>TORI ANN TIMMERMAN,<br><br>2205 270th St.<br>Donnelson, IA 52625<br><br>Respondent. | CASE NO.<br><br><br>VERIFIED PETITION FOR RETURN OF CHILD TO MEXICO AND FOR ISSUANCE OF SHOW CAUSE ORDER |

**The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq.**

Petitioner, Dustin Lee Staggers ("Father"), by and through his undersigned attorneys, files this Verified Petition for Return of Child to Mexico and for Issuance of Show Cause Order (the "Petition"), against the Respondent, Tori Ann Timmerman ("Mother"), (collectively, hereinafter as the "parties").

**I. INTRODUCTION**

1. This Petition is filed as a result of the wrongful removal from Mexico to the United States of the parties' daughter ELS, born in 2017 (the "child"). The child is a citizen of

the United States and has temporary Mexican residency.[1] The wrongful removal occurred on or about November 5, 2023, about 3:30 a.m.

2. Father is the child's Father. Father is a citizen of the United States and has temporary Mexican residency.

3. Mother is the child's Mother. Mother is a citizen of the United States and has temporary Mexican residency.

4. This Petition is brought pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980.[2] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[3] (hereinafter "ICARA").

5. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Mexico on October 10, 1991.[4]

6. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## II. JURISDICTION

7. This Court has jurisdiction under ICARA § 9003 because this case involves the removal of a child under the age of 16 from her habitual residence in Mexico to the United

---

[1] The first step of the process to obtaining Mexican citizenship.
[2] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in 51 Fed. Reg. 10493 (1986).
[3] 22 U.S.C. § 9001 et seq.
[4] Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed November 21, 2023).

States. The child is currently located within the jurisdiction of this Court in the Southern District of Iowa.

8. Congress has specifically granted concurrent original jurisdiction to the federal courts of actions arising under the Hague Convention. ICARA § 9003. State court custody actions may not trump clearly granted federal court jurisdiction to decide actions arising under the Hague Convention.

### III. FACTS

9. The parties have never been married to each other.

10. The parties met at Father's restaurant in Louisville KY the summer of 2015.

11. December 2015, the parties moved to Myrtle Beach SC.

12. Around September 2016, Mother conceived the child.

13. Wanting to live in a more family friendly environment, the parties moved to Gainesville GA, where the child was born that same year.

14. Father appears on the child's birth certificate.

15. November 2017, the family moved to Milton FL to reunite with their best friends.

16. The parties frequently spoke of moving out of the country to see the world with the child.

17. July 2018, when Father's best friend died of pancreatic cancer, the parties thought this was then the time to try and go see the world with the child.

18. April 2019, the family moved to Merida, Mexico.

19. Father works two months of the year traveling to the United States for his business.

20. March 2020, as COVID was ramping up, the parties stayed with the child's paternal grandmother and step-grandfather in Donnelson IA just in case the borders were shut down due to the growing pandemic.

21. June 2020, the parties moved to Father's hometown of Tampa FL.

22. The parties enjoyed living in Florida but after just signing a new lease to stay for a second year, their building flooded, forcing the family to relocate. That and the rising cost of living in Florida, had the parties deciding move to New Orleans LA in August 2021.

23. Soon after moving to Louisiana the parties' landlord decided to turn their unit into an Airbnb. It was then that the they made a collective decision to move back to Mexico to raise the child.

24. Due to the child's schooling and Father's work, moving to Mexico City instantly wasn't feasible. As such, in August 2022, they moved back Florida with plans to leave for Mexico in March of 2023.

25. March 2023, the family moved into a condo in Mexico City, Mexico, the mother signing a three-year lease for same.

26. Prior to leaving the United States, the parties established with the Mexican embassy in the United States that they were looking to stay in Mexico on a long-term basis and proceeded to start the process of obtaining Mexican citizenship.

27. After arriving in Mexico City, Mexico, the parties finished the process and Mother Father and the child all became temporary residents of Mexico.

28. The child started school the week after the family arrived in Mexico City.

29. While out of town for his work, everything appeared normal at home to Father. Father talked to the daughter multiple times a day. As usual, the parties regularly texted each other back and forth most of the most days, with no hint of anything out of the ordinary.

30. November 3, 2023, after a typical day of the parties texting back and forth about how the child enjoyed Halloween and life in general, Father attempted to get a hold of Mother, but her phone was going to voicemail.

31. On the evening of November 3, 2023, Father decided to tap into the home security camera system, because all his calls to Mother were now going into her voicemail.

32. It was that evening that Father overheard Mother and the child's maternal grandmother discussing attempting to get the child out of Mexico.

33. Mother could be heard suggesting that: she couldn't just leave immediately; she needed time; that given the choice the child wouldn't even choose to go with her; and that maybe they should just kill Father. The maternal grandmother then reminded Mother what a good shot the former's husband is.

34. On November 4, 2023, Father started to text Mother attempting to work things out in the best interest of the child and suggesting Mother did not need to have him killed.

35. Mother continued to ignore Father's text messages.

36. Father did briefly speak with the child for a few minutes wherein he sensed that something was up as the child kept looking out of the corner of her eyes like someone was standing nearby to make sure make sure she didn't say anything wrong.

37. Father became concerned that Mother would try to take the child out of Mexico without his consent, and commenced sending numerous text messages to Mother saying she can't take the daughter from him.

38. Upon arriving back into Mexico City on November 5, 2023, Father found Mother and the child, as well as all of Mother's and the child's possessions missing from their residence in Mexico City, Mexico.

39. After then speaking with the apartment building's doorman, Father learned that Kelly, Mother, and the daughter fled the building with a lot of luggage at about 3:30 a.m. on that day.

40. "The Convention does not define 'habitual residence,' but, as the Convention's text and explanatory report indicate, a child habitually resides where she is at home."[5]

41. The child attends Montessori del Bosque school in Mexico City, Mexico.

42. The child receives routine medical care and dental care in Mexico.

43. The child participates in extracurricular activities, playdates, and cultural activities in Mexico.

44. The child has numerous friends in Mexico.

45. The child is fully involved and integrated in all aspects of daily and cultural life in Mexico.

46. The child is fluent in both Spanish and English.

47. Father is fully involved in all of the child's schooling, medical care, mental health care, dental care, and other activities in Mexico.

48. The child is "at home" in Mexico.

49. Mexico is the child's habitual residence.

### IV. COUNT I – WRONGFUL REMOVAL

---

[5] Monasky v. Taglieri, 140 S. Ct. 719, 722

50. Father restates and re-alleges the allegations contained in Paragraphs 1 through 49 as if fully set forth herein.

51. The Hague Convention applies to cases in which a child under the age of 16 years has been removed or retained from his or her habitual residence in breach of rights of custody under the law of the child's habitual residence, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

52. The child is under the age of 16.

53. The child's habitual residence is, and was Mexico on the date Mother removed her from Mexico.

54. This Court must apply the laws of Mexico to determine the Father's rights of custody under the Hague Convention.

55. From the totality of the circumstance's perspective as of the date of removal, which occurred on November 3, 2023, Mexico was the child's home.

56. Mexico is the child's ordinary home and holds a degree of settled purpose from the child's perspective.

57. Mexican jurisprudence recognizes the laws of "patria potestas."

58. As herein, when the parents of a child born outside of wedlock separate, patria potestas directs that both parents continue to exercise paternal authority rights over a child.

59. Even more importantly, under the Mexican law of patria potestas, both parents must consent to the removal of such child.

60. At the time Mother removed the child from Mexico to the United States the Father had Hague Convention article 5a "rights of custody" to the child under Mexican law.

61. Parental custody of a child under Mexican law includes rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.

62. It is a breach of joint parental custody, under Mexican law, for one holder of joint parental custody to remove a child from Mexico without the consent of the other holder of joint parental custody.

63. Mother's removal of the child from Mexico to the United States is, therefore, in breach of Mexican law.

64. Mother's removal of the child from Mexico to the United States is, therefore, in breach of Father's Hague Convention article 5a "rights of custody."

65. At the time Mother removed the child from Mexico to the United States, the Father was exercising his rights of custody within the meaning of Articles 3 and 5a of the Convention.

66. Mother's removal of the child from Mexico to the United States is, therefore, wrongful under the Hague Convention because Mother has removed the child from her habitual residence of Mexico, in breach of Father's rights of custody to the child under Mexican law, which Father was exercising at the time of the removal.

67. Notice is given in this pleading that Father is relying upon foreign law. FED. R. CIV. P. 44.1.

68. Father has never consented or acquiesced to the removal of the child from Mexico to the United States.

69. Father has promptly, and to the best of his ability, taken all legal steps available to him to seek the return of the child to Mexico.

70. The child is currently physically located within the Southern District of Iowa at 2205 270th St. Donnelson IA 52625.

## V. COUNT II – ARTICLE 18 RETURN

71. Father restates and re-alleges the allegations contained in Paragraphs 1 through 79 as if fully set forth herein.

72. Father invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.

## VI. PROVISIONAL AND EMERGENCY REMEDIES[6]

73. Father requests that the Court issue a Show Cause Order forthwith ordering the appearance of Mother before this Court on the first available date on the Court's calendar, and directing Father to serve the Show Cause Order on Mother forthwith by private process.

74. Unless this Court takes expedited action to issue the initial order requested by the Father, irreparable harm will continue to occur to the well-being of the child in that she will continue to be deprived of her Father. Further, the Hague Convention requires expedited action and sets a six-week aspirational goal for final determination of this case.

75. Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004. In this case, the law referred to is that of Iowa.

---

[6] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

76.     In Iowa, the Uniform Child Custody Jurisdiction and Enforcement Act (hereinafter "UCCJEA") is the source for statutory law governing, inter alia, the resolution of both domestic and international child custody disputes and is codified as Iowa Code Title XV, Subtit. 1, Ch. 598B et seq.  Iowa Code § 598B.210 addresses the appearance of the parties and the child in such cases. That section authorizes this Court to order the appearance of the child and custodian or custodians together and authorizes the court to "enter any orders necessary to ensure the safety of the child . . ." Iowa Code § 598B.210(3). This Court therefore has the authority to issue a show cause order, ordering the appearance of Mother (and the child if the Court so wishes) in that the provisions of 22 U.S.C. § 9004 can and have been met.

## VII. UCCJEA DECLARATION

77.     The details regarding the child that are required to be provided under the Iowa UCCJEA - Iowa Code § 598B.209, are as follows:

   A.     The child is currently located with Mother within the jurisdiction of this Court at 2205 270th St. Donnelson IA 52625

   B.     For the five years immediately preceding the filing of this Petition, the child has lived as follows: (A) From birth to November 2017, the child lived with Father and Mother in the state of Georgia; (B) from November 2017 to March 2019, the child lived with Father and Mother in the state of Florida; (C) from April 2019 to March 2020, the child lived with Father and Mother in Mexico; (D) from March 2020 to June 2020 the child lived with Father and Mother in the state of  Iowa; (E) from June 2020 to August 2021 the child lived with Father and Mother in the state of Florida; (F) from September 2021 to July 2022 the child lived with Father and Mother in the state of Louisiana; (G) from August 2022 to February 2023 the child lived with Father and Mother in the state of

Florida; (H) from March 23 to the present the child has lived with Father and Mother in Mexico; (I) the child is currently located in Iowa as a result of Mother's removal of the child from Mexico to Iowa beginning November 3, 2023.

    C.    Father does not have information of any custody proceeding concerning the child pending in any other court of this or any other State.

    D.    Father does not know of any person or institution not a party to these proceedings that has physical custody of the child or claims to have guardianship and parental responsibility, or legal custody or physical custody of, or visitation or parenting time with the child.

## VIII. NOTICE OF HEARING

78.    Pursuant to 22 U.S.C. 9003(c), the parties will be given notice of any hearing in accordance with the Iowa UCCJEA - Iowa Code § 598B.205 and all applicable Federal Rules.

## IX. ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

79.    Father has incurred, and will continue to incur, reasonable and necessary attorneys' fees, expenses and costs as a result of Mother's wrongful retention of the child.

    Respectfully submitted,

    WHITFIELD & EDDY, P.L.C.
    111 West Monroe Street, Suite 201
    Mount Pleasant, IA 52641-2016
    Telephone: (319) 385-9522
    Fax: (319) 385-3633
    Email: miller@whitfieldlaw.com

By: _____
    Diana L. Miller

WHITFIELD & EDDY, P.L.C.
699 Walnut Street, Suite 2000
Des Moines, IA 50309
Telephone: 515-288-6041
Fax: 515-246-1474

By *Sydnee Waggoner*
SYDNEE M. WAGGONER AT0015798
waggoner@whitfieldlaw.com

ATTORNEYS FOR RESPONDENT

ORIGINAL FILED.