## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA

DUSTIN LEE STAGGERS,

     Petitioner,

     v.

TORI ANN TIMMERMAN,

     Respondent.

Case No. 3:23-cv-00083-SMR-SBJ

## RESPONDENT'S TRIAL BRIEF

NOW COMES the Respondent, Tori Ann Timmerman ("Respondent"), by and through her attorneys, Masters Law Group, LLC, pursuant to *Federal Rule of Civil Procedure 52*, and submits the following governing authorities and factual basis as and for her trial position in the present action:

## <u>BACKGROUND</u>

1.    The Petitioner, Dustin Lee Staggers (hereinafter referred to as "Petitioner"), is a United States citizen and temporary Mexican resident born in the State of Florida of the United States of America (hereinafter referred to as the "United States").

2.    The Respondent, Tori Ann Timmerman (hereinafter referred to as "Respondent"), is a citizen of the United States. She is also a "respondent" within the meaning of 42 U.S.C. § 11602(6). On information and belief, Respondent is currently residing at a residence located in the State of Iowa of the United States of America.

3.    The parties are the parents of one (1) minor child, namely: E.L.S. (hereinafter referred to as the "minor child" or "child"), born April 18, 2017, in the State of Georgia of the

United States of America (the "United States"), and is currently age six (6). The child is under the age of sixteen (16) and is thus subject to the terms of this Convention in accordance with Article 4 thereof.

4.      Petitioner was present for the birth of the parties' minor child and is listed as the father on the minor child's birth certificate.

5.      The minor child lived with the parties in various locations throughout the United States from the time she was born until in or around the month of April 2019 where the parties moved for the period of less than one year to Merida, Mexico until March 2020 at which time they return to the United States and remained in the country until in or around March 2023.

6.      The parties resided together throughout the minor child's life in the United States in places including the States of Georgia, Florida, Iowa, and Louisiana.

7.      During the child's life Petitioner controlled the parties' finances given that Respondent was not working while Respondent was the minor child's primary caregiver.

8.      Petitioner's employment and businesses were always located in the United States, even during the brief periods of time the parties resided in Mexico. Accordingly, all bank accounts and finances were located in the United States.

9.      In or around March 2023, the parties moved to a condo in Mexico City with the minor child, with each of them being permitted to do so via a temporary residency that was set to expire in February of 2024.

10.     In or around June of 2024, the parties moved from the initial condo to another apartment in Mexico City.

11.     Respondent was never under the impression that the parties would remain in Mexico forever given that their entire lives had been spent in the United States, both parties' and

the minor child's family were located in the United States, and the parties had moved so frequently prior to going to Mexico that history led Respondent to believe that they would not remain in one place for any extended period of time.

12.     Throughout the parties' relationship, and during their time residing in Mexico after March 2023, Petitioner was extremely verbally, psychologically, emotionally, physically, and sexually abusive toward Respondent.

13.     The abuse that Respondent faced from Petitioner was frequent, violent, severe, and occurred in the presence of and/or in the same residence of or vicinity of the minor child.

14.     Further, Petitioner admitted during his sworn deposition testimony taken on or around February 12, 2024 to at least two instances of said physical abuse which resulted to severe bruising and visible injuries to Respondent's face of which there is photographic evidence of.

15.     In or around September 2023, Respondent visited family in the United States, and Petitioner unilaterally canceled her return flights, threatening to prevent her from ever seeing the minor child again and keeping her in Mexico when Respondent could not financially manage to secure her own return trip.

16.     In or around November 2023, Respondent made the decision to inform her family of the severe abuse she had undergone at the hands of Petitioner and made the decision to leave Mexico with the minor child for her and the minor child's safety.

17.     On or around November 5, 2023, Respondent left Mexico with the minor child and traveled to the State of Iowa to reside with her biological father and stepmother with the child where Respondent continues to reside with the minor child to date.

18.     On or around November 6, 2023, Respondent was granted an emergency protective order in the County of Lee Iowa State Court against Respondent based on photographic evidence

of physical abuse committed by Respondent against Petitioner coupled with written allegations of the abuse undergone by Respondent at the hands of Petitioner.

19.    On or around November 27, 2023, the parties entered into a Final Protective Order by Consent Agreement whereby both parties were represented by Counsel. This Order was entered into by agreement of the parties rather than having the case adjudicated on its merits.

20.    The Order agreed to by Father specifically addresses his permitted communications and interactions with the minor child until November 6, 2024, as follows with Father being referred to as "Respondent":

a.    Respondent is prohibited from contacting Petitioner except through the application AppClose and solely related to the Parties' shared custody of their minor child.

b.    Respondent shall not communicate with the Protected Party in person or through any means including third persons, except as specified below. This restriction shall not prohibit communication through legal counsel.

c.    Respondent may contact the Parties' minor child daily at 7:00 p.m. and such call should be facilitated through third-party Lonnie Timmerman or Kelly Timmerman.

d.    Respondent is prohibited from traveling to Petitioner's residence or the Parties' minor child's current school.

e.    The Parties' minor child shall remain in the State of Iowa pending further order from a court concerning the ongoing custody dispute.

## **LEGAL STANDARD**

The Convention, as implemented by *ICARA*, establishes legal rights and procedures for the return of children who have been wrongfully removed or retained during a child custody dispute. *Abbot v. Abbott*, 560 U.S. 1, 130 S. Ct. 1983 (2010). When such issues arise United States

district courts have concurrent original jurisdiction over such actions. *22 U.S.C.A. § 9003(a)*. Moreover, venue is proper under *28 U.S.C.A § 1391(b)* in the federal district where a substantial part of the events giving rise to an *ICARA* claim occurred. *28 U.S.C.A § 1391(b)*. If jurisdiction and venue are established, courts are vested with the authority to decide choice of forum for resolving the underlying child custody dispute. *22 U.S.C.A. § 9001(b)(4); 22 U.S.C.A. § 9003*. *ICARA* prohibits courts from making a final determination as to the child's custody. *22 U.S.C.A. § 9001(b)(4)*.

For an ICARA claim, a petitioner bears the burden of establishing a child was wrongfully removed or retained within the meaning of Article 3 of the Convention. *22 U.S.C.A. § 9003(e)*. *Article 3* of the Convention states:

> The removal or retention of a child is to be considered wrongful where-
>
> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Hague Convention, art. 3, T.I.A.S., No. 11670*. If the court determines a child was wrongfully removed or retained from the child's habitual residence, the court must order the child to be returned to the habitual residence unless the respondent can establish an affirmative defense. *22 U.S.C.A. § 9003(e)(2)*.

## ICARA and the Hague Convention

The Act "entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of 'habitual residence,' unless certain exceptions apply." *Norinder v. Fuentes,* 657 F.3d 526, 529 (7th Cir. 2011) (citing *Abbott v. Abbott,* 560 U.S. 1 (2010)). "Prime among [those exceptions], a child's

return is not in order if the return would place her at 'grave risk' of harm or otherwise in 'an intolerable situation.'" *Monasky v Taglieri,* 140 S. Ct. 719, 723 (2020) (*quoting Art. 13(b)*).

The removal or retention of a child is wrongful under the Convention if a child was habitually resident in the other country immediately prior to the removal or retention. As the Ninth Circuit has recognized, the Convention does not define the term "habitual residence." *Holder v. Holder,* 392 F.3d 1009, 1015 (9th Cir. 2004). The Supreme Court's recent decision in *Monasky v. Taglieri,* 140 S. Ct. 719 (2020), provides helpful guidance on the issue. There the court held "that a child's habitual residence depends on the totality of the circumstances specific to the case." *Id.* at 723. The *Monasky* Court (citing *Redmond v. Redmond*, 724 F.3d 729,744 (7th Cir 2013) instructed that "courts must be 'sensitive to the unique circumstances of the case and informed by common sense".

The Convention as implemented by *ICARA*, establishes legal rights and procedures for the return of children from one signatory country to the other. *Abbott v. Abbott*, 560 U.S. 1, 130 S. Ct. 1983 (2010). When such issues arise, United States district courts have concurrent original jurisdiction over such actions. *22 U.S.C.A. § 9003(a)*. Moreover, venue is proper under *28 U.S.C.A. § 139 (b)* in the federal district where a substantial part of the events giving rise to an ICARA claim occurred. *28 U.S.C.A. § 139 (b)*. If jurisdiction and venue are established, courts are vested with the authority to decide choice of forum for resolving the underlying child custody dispute. *22 U.S.C.A.. § 9001(b)(4); 22 U.S.C.A. § 9003*. *ICARA* prohibits courts from making a final determination as to the child's custody. *22 U.S.C.A. § 9001(b)(4)*.

For an *ICARA* claim, a petitioner bears the burden of establishing a child was wrongfully removed or retained within the meaning of Article 3 of the Convention. *22 U.S.C.A. § 9003(e)*. Pursuant to *Foster v. Foster*, petitioner must establish by a preponderance of the evidence that:

1) the child was habitually residing in the other State;

2) the removal or retention of the child constituted a breach of custody rights attributed by the law of that State; and

3) the applicant was exercising those rights at the time of wrongful removal.

See *Foster v. Foster*, 429 F. Supp.3d 589,604 (W.D. Wis. 2019); see also *Murphy v. Sloan*, 982 F.Supp.2d 1065, 1073 (N.D. Cal. 2013) (quoting *Mozes v. Mozes*, 293 F.3d 1067, 1070 (9th Cir. 2001)).

To establish a prima facie case, the Petitioner must demonstrate that the child was a habitual resident of Mexico.  See *Noriander v. Fuentes*, 657 F.3d 526, 533 (7th Cir. 2011); see also 22 U.S.C. Section 9003 (e)(1)(A).  *Norinder* directs us that, "the first step for a court considering a [Hague] petition is to determine the child's habitual residence." Id.; see also *Asvesta v. Pestrousas*, 580 F.3d 100,1017 (9th Cir. 2013); *Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007); *Mozes*, at 293 F.3d 1067, 1075 (9th Cir. 2001).

 "[A] parent cannot create a new 'habitual residence' by the wrongful removal and sequestering of a child." *Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d. Cir.2001); see also *Miller v. Miller,* 240 F.3d 392, 400 (4th Cir.2001); *Friedrich v. Friedrich, supra,* 983 F.2d at 1402.; *Asvesta v. Petroutsas*, 580 F.3d 1000, 1012 (9th Cir. 2009). Habitual residence is the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective. *Kijowska v. Haines*, 463 F.3d 583, 588 (7th Cir. 2006); see also *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014).

In determining which country is the habitual residence of the children under the Hague Convention on International Aspects of Child Abduction, the Court of Appeals looks for the last shared, settled intent of the parents in an attempt to determine which country is the locus of the

children's family and social development. *Valenzuela v. Michel*, 736 F.3d 1173 (9th Cir. 2013); See also *Mozes v. Mozes*, 239 F.3d 1067, 1084 (9th Cir. 2001); See also *Farr v. Kendrick*, 824 F. App'x 480, 481 (9th Cir. 2020).

Shared parental intent may weigh more heavily in cases involving very young children who "lack the ability to truly acclimatize to a new environment" and that "shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country" *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006); "shared parental intent may be a proper starting point in many cases because parental intent acts as a surrogate' in cases involving very young children for whom the concept of acclimatization has little meaning." *Id. quoting Holder v. Holder*, 392 F.3d 1009, 1016–17 (9th Cir. 2004). The concept of 'last shared parental intent' is not a fixed doctrinal requirement, and we think it unwise to set in stone the relative weights of parental intent and the child's acclimatization. The habitual-residence inquiry remains essentially fact-bound, practical, and unencumbered with rigid rules, formulas, or presumptions. *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013).

The courts have, by necessity, also turned to the "shared intent" of the parents to determine habitual residence.  "When a child is too young to have an intent regarding her habitual residence, the touchstone inquiry is 'shared parental intent.' "  *In re Application of Adan*, 437 F.3d 381, 392 (3rd Cir. 2006); *Kijowska, supra,* at 587; *see Mendez v. May,* 778 F.3d 337, 344 (1st Cir. 2015). See also *Kenny v. Davis*, No. 3:21-CV-00023-SLG, 2021 WL 2275983 (D. Alaska May 10, 2021, *aff'd*, No. 21-35417, 2022 WL 501625 (9th Cir. Feb. 18, 2022) (the fact that the child lived in Alaska for four months, more than one-third of the child's life, meant that the child's habitual residence changed from Ireland to the United States). The minor children in *Adan* could not have habitually resided in England based upon their young age and the fact that they were habitually

gone from England with substantial periods of time spent in the United States, namely Arizona and Alaska, during the period in question as outlined by the Petitioner's pleading filed with this court. The minor children were habitually residents of the United States of America. *Id*.

"Where there is geographic stability and adequate duration, questions are to the purpose of the residence, will usually be pushed into the background". *Koch v. Koch*, 416 F.Supp 2d 645 (E.D. Wis 2006). To the extent that purpose plays a part in determining whether a child is habitually a resident in a county, it is necessary to prove only that there is a sufficient degree of continuity to be properly described as settled. *Id*.

The evidence will show that the habitual residence of the minor child is the United States given the extended period of time for which the child has resided there, the age of the child, and the connections the child has made therein and thereto that have provided a sufficient degree of continuity to be properly described as settled.

## **ARGUMENT**

### I.    **The Habitual Residence of the Minor Child is the United States.**

If the court determines a child was wrongfully removed or retained from the child's habitual residence, the court must order the child to be returned to the habitual residence unless the respondent can establish an affirmative defense. *22 U.S.C.A. § 9003(e)(2)*. The Convention does not provide a definition for the term "habitual residence." As the Supreme Court stated in *Monasky v. Taglieri,* 140 S. Ct. 719 (2020), "for older children capable of acclimating to their surroundings, courts have long recognized facts indicating acclimatization will be highly relevant.". *Id*.  In this case, however, the child had not reached two years of age at the time of the removal.  He was in his mother's care at home, beginning to learn to speak, and not yet attending school, and so was

too young to have become acclimated to his New Zealand environment. *See, e.g., Kijowska v . Haines,* 463 F.3d 583, 587 (7th Cir. 2006).

In determining which country is the habitual residence of the children under the Convention, the Court of Appeals looks for the last shared, settled intent of the parents in an attempt to determine which country is the locus of the children's family and social development. *Valenzuela v. Michel*, 736 F.3d 1173 (9th Cir. 2013); See also *Mozes v. Mozes*, 239 F.3d 1067, 1084 (9th Cir. 2001); See also *Farr v. Kendrick*, 824 F. App'x 480, 481 (9th Cir. 2020).

In the present case, the minor child could not have habitually resided in Mexico as the child and parties were habitually gone from Mexico with substantial periods of time spent in the United States throughout and for the majority of the child's life, namely in Georgia, Florida, Louisiana and Iowa, during the period in question as outlined by the Petitioner's pleading filed with this Court. The minor child is a habitual resident of the United States of America, not Mexico.

This Court should examine the totality of the circumstances specific to the present case including acclimatization of the minor child in the United States and the minor child being settled in the United States of America rather than Mexico. The minor child is approximately six (6) years older than the child in the *Monasky* case making Father's alleged intentions substantially less relevant, and the evidence will show that both Petitioner and Respondent, individually and collectively, immersed the minor child in American culture throughout her life, and intended for the child to be habitually resident in the United States. The below non-exhaustive actions of the parties clearly demonstrate that the United States of America, not Mexico, is the habitual residence of the child:

    a.   Petitioner agreed to the entry of consensual court order on November 27, 2023, in Lee County in the State of Iowa of the United States of America stipulating that "The Parties

minor child shall remain in the State of Iowa pending further order from a court concerning the *ongoing custody dispute*" just two days before filing the instant Petition. The Iowa Court Order prohibits Petitioner from traveling to the child's current school or current residence and explicitly includes parenting time provisions expressly permitting one daily phone call with the minor child and Petitioner facilitated by a third party pending further order in the explicitly referenced ongoing Iowa custody proceedings continue. All of the aforementioned legally binding orders entered into in the state of Iowa were agreed to by Petitioner and remain effective by agreement of the parties until November 6, 2024, or until further court order in the ongoing custody dispute in Iowa.

b. The minor child is a United States citizen, and her temporary Mexican residency expires on February 28, 2024.

c. Petitioner is a citizen of the United States and a temporary Mexican resident.

d. Respondent is a United States citizen, and her temporary Mexican residency expires on February 28, 2024.

e. Petitioner maintains a United States business and mailing address, has only ever filed United States income taxes, and travelled for months at a time to the United States throughout the entire seven (7) month period he alleges established habitual residency over the minor child in Mexico.

f. All of Petitioner's banking and finances were located in the United States during the brief periods of time the parties resided in Mexico.

g. On or around February 12, 2024, Petitioner expressed his intention in his sworn deposition testimony to maintain his businesses and employment in the United States, not Mexico.

h.  The parties celebrated American holidays and participated in all of the cultural customs and traditions in the United States.

i.  The minor child has healthcare coverage in the United States and the parties had American healthcare coverage for themselves and the minor child at the time they moved to Mexico in March 2023, and never secured Mexican healthcare during the short period of time they resided therein.

j.  The minor child is fluent in English and not Spanish.

k.  The parties established medical care for the child in the United States.

l.  Both parties and the minor child's entire families reside in the United States and the minor child has established meaningful connections with them having lived with the child's grandfather and step grandmother for extended periods of time.

m.  The minor child established meaningful friendships in the United States.

n.  The parties previously enrolled and have had the child participate in activities in the United States.

o.  The parties did not intend to raise the minor child in Mexico and remain therein and had a shared intent to return to the United States.

p.  Respondent never secured any employment in Mexico nor did she have a plan to secure employment in Mexico.

q.  There were no ongoing custody proceedings in Mexico at the time Respondent left Mexico with the minor child nor were there any ongoing custody proceedings at the time Petitioner filed the present action.

The parties' history of frequent, repetitive moves to vastly different locations with the minor child gave Respondent no indication that this particular move would actually last or that

Petitioner would desire to stay in Mexico for any extended period of time given the parties' prior moves. Respondent had little to no say given her lack of financial stability and reliance of Petitioner's finances to support herself and the minor child, and so she and the minor child were required to essentially follow Petitioner wherever he chose to go at that juncture, which just so happened to be Mexico in March of 2023.

However, it is abundantly clear that the minor child has spent the substantive majority of her life in the United States and is acclimatized to life therein. During the child's brief time in Mexico, she spent the vast majority of time with her mother given the fact that her father was absent for substantial periods of time in the United States for alleged business purposes and not involved in day-to-day rearing or care for the child. The child did not make new friends and struggled with the minimal Mexican schooling she attended given the language and educational barriers she faced as a consequence of being acclimatized to life in the United States.

Further, Petitioner maintained significant connections to the United States even while physically in Mexico and Respondent never intended to remain in Mexico nor did she understand Petitioner's intent to remain therein as is further evidenced by both parties' and the minor child's temporary Mexican residency scheduled to end mere months from Petitioner's initial date of filing the Petition. Additionally, and perhaps most significantly, Petitioner's consent to court proceedings in the State of Iowa explicitly stipulating parenting time provisions and residency provisions related to the minor child and where the child is permitted to live further establishes Respondent's intent for the child to remain in the United States. Petitioner agreed to a legally binding United Stated court order stipulating his permitted communications and ability to contact the minor child and ordering the child to remain in United States thereby establishing the United

States as the child's habitual residence not only by reason of the child being at "home" in the United States but by a clear and court ordered shared intent of the parties.

Because the minor child's habitual residence at the time the child was removed from Mexico was the United States, the parties' custodial rights are defined by United States law and Respondent's removal was not wrongful. *Convention Art. 3(a)*.

## AFFIRMATIVE DEFENSES

In the event that a petitioning party can show that a child was wrongfully removed or retained, the Convention provides certain exceptions to its mandate that the child be returned to his or her habitual residence. *Avesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009). The affirmative defenses under the Convention are set forth in *Articles 13* and *Article 20* of the Convention. *Nelson v. Petterle*, 782 F.Supp.2d 1081, 1093 (E.D. C.A. 2011).

Respondent has raised two (2) affirmative defenses supporting a denial of the return of the minor child to Mexico which are discussed below.

**I.    The Respondent Subsequently Acquiesced to the Minor Child Remaining in the United States.**

Under *Article 13(a)*, a respondent can avoid the return of the child by proof that the petitioner "subsequently acquiesced to the [child's] removal or retention." *Convention, Art. 13(a)*. The respondent has the burden of proof of proving this affirmative defense by a preponderance of the evidence. *22 U.S.C.A § 9003(e)(2)(B)*. Consent and acquiescence are two separate and "analytically distinct" affirmative defenses. *Padilla v. Troxell*, 850 F.3d 168 (4th Cir. 2017) (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) and citing *Darin v. Olivero-Huffman*, 746 F.3d 1, 14 (1st Cir. 2014)).

The defense of consent "concerns the petitioner's conduct before the contested removal or retention" and acquiescence "concerns whether the petitioner subsequently agreed to or accepted

the removal or retention." *Id*. at 175. To establish consent, courts focus on the parties' conduct prior to the removal or retention. *Id*. at 176. However, "conduct after removal can be useful in determining whether consent was present at the time of removal." *Gonzalez-Caballero v. Mena*, 251 F.3d 789 (9th Cir. 2001) at 794. For both the consent and acquiescence defenses, however, the inquiry will ultimately turn on the petitioner's subjective intent. *Padilla* at 176.

To show acquiescence, courts "look to evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a consistent attitude over a significant period of time." *Id*. Subsequent acquiescence does not invite the words and actions of each party "to be scrutinized for a possible waiver of custody rights." *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996) (citing *Baxter v. Baxter*, 423 F.3d 363, 371-72 (3rd Cir. 2005) at 1070. This defense requires an inquiry into the petitioner's subjective intent. *Id.*

In the present matter, Father subsequently acquiesced to the minor child's removal from Mexico to the United States as evidenced by November 27, 2023 Final Protective Order by Consent Agreement Domestic Abuse attached as *Exhibit A*. On or around November 27, 2023, Father willingly agreed to have the County of Lee Iowa State Court enter a yearlong protective order against him and in favor of Mother in the State of Iowa in the United States of America. The Order agreed to by Father specifically addresses his permitted communications and interactions with the minor child until November 6, 2024 as follows with Father being referred to as "Respondent".

a. Respondent is prohibited from contacting Petitioner except through the application AppClose and solely related to the Parties' shared custody of their minor child.

b.  Respondent shall not communicate with the Protected Party in person or through any means including third persons, except as specified below. This restriction shall not prohibit communication through legal counsel.

c.  The Court makes no findings of fact.

d.  Respondent may contact the Parties' minor child daily at 7:00 p.m. and such call should be facilitated through third-party Lonnie Timmerman or Kelly Timmerman.

e.  Respondent is prohibited from traveling to Petitioner's residence or the Parties' minor child's current school.

f.  The Parties' minor child shall remain in the State of Iowa pending further order from a court concerning the ongoing custody dispute.

By willingly agreeing to the entry of a legally binding court order in the United States requiring the minor child to remain in Iowa for the entire enforceable period of one year, Father subsequently acquiesced to the minor child's retention in the United States. This acquiescence is pursuant to the Agreed Order that Father voluntarily consented to on November 27, 2023 explicitly stating the minor child is to remain in the State of Iowa until November 6, 2024. As the Supreme Court established in *Padilla*, Father's actions taken in the Iowa court proceedings show that he willingly consented and agreed to the child remaining in the United Stated in valid judicial proceedings thereby acquiescing pursuant to *Article 13(a)* of the Convention.

Not only did Respondent consent to the child remaining in Iowa for a period of at least one (1) year pending completion of or further court order in the ongoing Iowa custody proceedings, but he agreed to parenting time provisions explicitly in the State of Iowa. To exemplify this, Respondent acquiesced to parenting time with the minor child via daily phone calls facilitated by a third party and agreed not to go to the child's residence or school. By addressing the minor child's

school and his ability to travel thereto in the State of Iowa, Respondent further acquiesced to the child attending school in Iowa for the one-year period as stipulated in the Agreed Order, further emphasizing his subsequent acquiescence to the child's retention in the United States by consenting to her attending school in the United States.

Father's subjective intent is clearly evidenced by his entering into a consensual agreed order in a United States state court stipulating how and when he may communicate with the minor child. Father had the opportunity to have the case heard on its merits and chose instead to enter into an agreed Final Protective Order in a United States court that would be legally binding in nature for a period of one year. Father did so willingly, consensually and under no legal obligation. Father's actions and conduct were subjectively intentional and resulted in a legally binding court order whereby he explicitly agreed the minor child would remain in the United States.

For these reasons, this Honorable Court should deny Petitioner's request that the minor child be returned to Mexico as Petitioner subsequently acquiesced to the child's retention in the United States of America.

## II.     There is a Grave Risk of Harm to the Minor Child if she is Returned to Mexico or the Minor Child will be Otherwise Exposed to an Intolerable Situation.

Under *Article 13(b)*, a respondent can avoid the return of the child by proof with clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Convention, Art. 13(b)*; see also *Fabri*, 221 F. Supp. 2d. at 873; *Golan v. Saada*, 596 U.S. ___ (2022) at 596. Under this defense, Respondent must show, by clear and convincing evidence, that the child, if returned to Mexico, would experience something greater than would normally be expected in taking a child away from one parent and passing the child to another. *Cuellar*, 596 F.3d. 505 at 509.

When a party has the burden of proving any claim or defense by clear and convincing evidence, that party must present evidence that leaves the finder of fact with the firm belief that it is highly probable that the factual contentions of the claim or defense are true. *Colorado v. New Mexico*, 104 S.Ct. 2433, 2438 (1984). This affirmative defense does not require the Court to find that the child was previously harmed but to, instead, determine whether the child would be exposed to grave risk of physical or psychological harm, or an otherwise intolerable situation, upon a return to the habitual residence. *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008). Past harm, including alleged negligence, is probative of whether a child will suffer upon returning to the same circumstances. *Baran*, 526 F.3d 1340 at 1346.

The Convention is not intended to be an alternate forum for child custody issues; "a court's role in enforcing the Convention is not to settle a custody dispute between the parties, but rather to restore the status quo prior to any wrongful removal or retention." *Ortiz v. Martinez,* 789 F. 3d 722, 728 (7th Cir. 2015); see also *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010); 42 U.S.C.A 11601(b)(4). A Court that receives a Petition under the Hague Convention may not resolve the question of who, as between the parties, is best suited to have custody of the child. *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001). Concern for the welfare of the child is only considered in extreme cases. *Cuellar*, 596 F.3d 505 at 508. Accordingly, the court has no occasion to engage in any consideration of the best interests of the child. *Garcia v. Pienlo*, 125 F. Supp. 3d 794 (N.D. Ill. 2015), *aff'd* 808 F.3d 1158 (7th Cir. 2015); *see* U.S. State Department, Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494 "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." *Accord, Walker v. Kitt,* 900 F. Supp. 2d 849, 862 (N.D. Ill. 2012); see also *Holder*, 392 F.3d at 1013; *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).

"*Article 13(b)* of the Convention and *42 U.S.C. § 11603 (e)(2)(A)* provides that when a respondent demonstrates by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation, the automatic return required by the Convention should not go forward." *Norinder v. Fuentes,* 657 F. 3d 526, 534 (7th Cir. 2011); see also *Golan*) (quoting *Abbott*, 560 U.S. at 10); *Cuellar*, 596 F.3d at 508.

Grave risk of harm may be established where the petitioning parent abused the responding parent. Historically, courts have interpreted grave risk of danger narrowly. However, recent federal court decisions have applied greater latitude to grave risk of danger assessments for domestic violence. *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000); *Elyashiv v. Elyashiv*, 353 F.Supp. 2d 394 (E.D. NY 2005); *Olhuin v. Del Carmen Cruz Santana*, 2005 U.S.Dist. LEXIS 408 (E.D. NY 2005); *Van de Sande v. Van de Sande*, 431 F.3d 567 (7th Cir. 2005); *In Re Application of Adan*, 437 F.3d 381 (3rd Cir. 2006); *Koch v. Koch*, 450 F.3d 703 (7th Cir. 2006); and *Davies v. Davies*, 717 Fed. Appx. 43 (2d Cir. 2017).  Repeated physical and psychological abuse of a child's mother by the child's father, in the presence of the child (especially a young child, as in this case), is likely to create a risk of psychological harm to the child. *Khan v. Fatima*, 680 F.3d 781, 787 (7th Cir. 2012).

The United States Supreme Court's recent decision in *Golan v. Saada* interpreted *Article 13(b)* of the Hague Convention involved a mother flying her minor child from Italy to the United States. 596 U.S. 142, S. Ct. 1880 (2022). Although the minor child's residence was found to be Italy, the Court also found that returning the child to Italy would expose him to a grave risk of harm. *Id*. at 508. While the child "was not the target of violence, undisputed expert testimony established that domestic violence disrupts a child's cognitive and social-emotional development, and affects the structure and organization of the child's brain." *Id*. The Court cited that "Article

13(b) lifts the Convention's return requirement" pursuant to Article 12 and leaves "a court with the discretion to grant or deny return." *Id.* (slip opin. At 9 – 11). The Supreme Court in *Golan* further emphasized that courts must "abide by the Convention's requirement that courts addressing return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute." *Id.*

In the case of *Walsh v. Walsh*, the First Circuit denied the return of the parties' minor child despite no finding of abuse against the children themselves because the Court found that the father had the "propensity" for abuse against the children based on his prior abuse against the children's mother. *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000). The court in *Walsh* found that the quantum here of risked harm, both physical and psychological, was high. *Id*. at 219. The husband had demonstrated that his violence knew not the bonds between parent and child or husband and wife, which should restrain such behavior. *Id*. at 220. The court also noted that credible social science literature established that serial spousal abusers are also likely to be child abusers. *Id*. The Court declared that both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser. *Id*. The Court cited a congressional resolution that specifically found that "the effects of physical abuse of a spouse on children include…the potential for future harm where contact with the batterer continues" and that "children often become targets of physical abuse themselves or are injured when they attempt to intervene on behalf of the parent." *Id*. These factors were sufficient to make a threshold showing of grave risk of exposure to physical or psychological harm. *Id*.

In *Miltiadous v. Tetervak*, the Court held that evidence of the father's physical and emotional abuse of the mother established the affirmative defense of grave risk of harm that returning the children to Cyprus would expose them to physical or psychological harm or an

otherwise intolerable situation. *Miltiadous v. Tetervak*, 686 F. Supp. 2d (E.D. Pa 2010). The court in *Miltiadous* believed that the mother testified credibly about extensive physical and emotional abuse that she suffered throughout her marriage. *Id*. at 551. She testified that the father beat her repeatedly and, at one point, broke her nose. *Id*. at 554. She testified that she required surgery on her nose because of this incident. *Id*. She also testified that the father would drink heavily and become enraged at her and the children. *Id*. She testified that the father kept a gun in the house and threatened to kill her. *Id*. According to the mother, the father aimed the gun at her several times but did not shoot. *Id*. The father admitted that the two argued often and that he hit the mother but in self-defense. *Id*. He denied abusing the mother; however, the court found his testimony to be not credible. *Id*. The mother's testimony was supported by testimony from her mother, who testified that, as a result of her visits to Cyprus with the mother, she suspected that there was significant spousal abuse in Cyprus. She added that she witnessed the abuse firsthand while the family was in the United States on vacation. *Id*. She testified that at times, the father became highly agitated, yelled, and cursed at the family. *Id*. Specifically, the mother's mother testified that the father also pushed her and threatened to harm her and her family. *Id*.

The *Miltadous* Court held that even though there was no "definitive evidence" that the minor child suffered from psychological abuse or trauma, the minor child's return would expose him to a grave risk of physical and psychological harm. *Id*. at 557. The Court reasoned that the minor child was not insulated from the likelihood of future physical abuse given Petitioner's inability to control his temper and his pattern of domestic abuse and threats. *Id*. As for psychological harm, the Court reasoned that a separation from the child's mother and brother would likely cause the child harm as well. *Id*.

In *Silva v. Dos Santos*, the United States Court of Appeals for the Eleventh Circuit recently found that non-credible testimony could have been used as corroborating evidence that the return of a minor child to Brazil represented a "grave risk" to the child. *Silva v. Dos Santos*, 68 F.4th 1247 (11th Cir. 2023). The Court also held that "a single witness's testimony alone and uncorroborated by any other evidence can support a finding by clear and convincing evidence," holding that the district court erred in "concluding that a single witness's testimony is necessarily insufficient to satisfy the clear-and-convincing evidence standard." *Id*. at 1258. The Court noted that "ICARA requires the respondent provide 'clear and convincing evidence' that the exception applied…and that standard does not necessarily mandate that a witness's testimony be corroborated to be credited by the fact finder." *Id*. at 1259; *22 U.S.C. § 9003(e)(2)*.

It is clear that courts have found that sufficiently serious threats and violence directed by a petitioning parent at a responding parent can constitute "grave risk of harm" to the child as well and permit a court to refrain from repatriating a child wrongfully removed from his or her country of habitual residence under the Convention. *Gomez v. Fuenmayor*, C.A.11 (Fla.) 2016, 812 F.3d 1005. "[T]he gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005). Thus, a court may not only consider the probability of the threat of harm, but also the nature of the harm itself to the child. *Id*.

In the present case, Respondent underwent severe physical and psychological abuse at the hands of Father throughout the course of their relationship including violent, repeated, physical abuse resulting in severe bruising, bleeding and various other injuries to the face and body, some of which some were clearly visible not only to the parties but to the minor child. There is photographic evidence of a number of Respondent's injuries, and Petitioner actively admitted

during his sworn deposition testimony to physically assaulting Respondent resulting in severe bruising to the head and facial region on multiple occasions.

However, even without photographic evidence and Petitioner's sworn deposition testimony admitting the allegations, courts have found that parties established grave risk based on the credibility of testimony alone. Outside of the photographic evidence and Petitioner's sworn deposition testimony admitting to inflicting physical injuries on Respondent, Respondent was also subjected to additional physical attacks by Petitioner; repeated and harmful verbal and psychological abuse in the presence of the minor child; and underwent frequent sexual assaults at the hands of Petitioner during the course of their relationship. Further, a majority of the aforementioned abuse at the hands of Petitioner against Respondent took place while in the same residence as or within close proximity of the minor child. The risk of exposure of psychological or physical harm to the minor child materializing in the event that this Court orders her return to Mexico is sufficiently grave to justify a denial of Petitioner's request for return of the minor child to Mexico.

It is the unfortunate truth that the vast majority of "abductors" in Hague Convention matters are women and that the most common reason for these "abductions" is to flee situations of domestic violence. The "grave risk" exception to the return requirement under *Article 13(b)* of the Convention was drafted to ensure that children would not be exposed to or required to be returned to individuals who have the propensity for violence that Petitioner has shown on repeated occasions, both through his inhumane actions and oral admissions, that he possesses. United States Courts have ruled that "grave risk" can be established by abuse at the hands of a child's father to a child's mother which is likely to create a risk of psychological, emotional and/or physical harm to a child. As was the case in *Walsh*, Respondent fled from the petitioning parent in the present

case to avoid further instances of abuse and to protect the minor child from the threat of that harm befalling the child either physically or psychologically beyond what it already had.

Further, on November 6, 2023, Respondent was granted an Emergency Protective Order by an Iowa State Court listing Mother as a protected party against Father based on photographic evidence of physical abuse and various other written allegations. Later that month, and on November 27, 2023, a Final Protective Order by Consent Agreement for Domestic Abuse was entered by the same court in Iowa protecting Respondent against Petitioner by agreement of the parties for a period of one (1) year. Respondent actively chose not to litigate the matter or have the allegations therein adjudicated on their merits and instead agreed to a legally binding Protection Order explicitly stipulating his communication schedule with the Minor Child and whereby the Minor Child would be required to remain in the State of Iowa. The Order remains in effect by agreement of the parties and is scheduled to remain so until November 6, 2024.

Ultimately, the minor child's return to Mexico will have grave psychological, emotional and physical consequences on the child. The minor child's living conditions in Mexico without Respondent's presence are unclear and Petitioner was extremely physically, psychologically, and emotionally abusive to Respondent during the course of the relationship. Respondent and the minor child should not be forced by this Court to be exposed said abuse again by means of a Return Order. Further, the minor child is at grave risk of either witnessing this abuse or experiencing it herself should she be made to return to Mexico with Petitioner and is at high risk of being returned to an otherwise intolerable situation. Petitioner has shown his repeated propensity for violence and inability to control his temper and emotions by exhibiting a pattern of domestic abuse, and the minor child will be further psychologically harmed by either forcing Respondent to risk returning to Mexico and undergo severe physical and psychological abuse at the hands of Petitioner to

protect the minor child or being separated from her mother who has been primary caregiver throughout her life as well as her family and entire support system in the United States. The magnitude of the potential harm is so severe in this case that the gravity of risk is simply too grave to order return of the minor child to Mexico.

For these reasons, there is a grave risk that her return to Mexico would expose the child to harm or an otherwise intolerable situation under *Article 13(b)* of the Convention and Petitioner's Petition should be denied on those grounds.

## CONCLUSION

For the aforementioned reasons, Respondent, Tori Ann Timmerman, respectfully requests that the Petitioner's Verified Complaint and Order for Return of the Minor Child to Mexico be denied.

Dated this 27th day of February 2024.


MASTERS LAW GROUP LLC                        Respectfully Submitted,
Anthony G. Joseph, Esq
Erin E. Masters, Esq.                        /s/ Anthony G. Joseph
1900 Spring Rd, Suite 530                        Anthony G. Joseph
Oak Brook, Illinois, 60523
Phone : (312) 609-1700
Facsimile : (312) 893-2002
ajoseph@masters-lawgroup.com
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of February 2024, a copy of the foregoing

*Respondent's Trial Brief* was electronically filed and sent to all counsel of record in this matter.

/s/ Anthony G. Joseph
Anthony G. Joseph

MASTERS LAW GROUP LLC
Anthony G. Joseph, Esq.
Erin E. Masters, Esq.
1900 Spring Rd, Ste 530
Oak Brook, Illinois 60523
Phone : (312) 609-1700
Facsimile : (312) 893-2002
ajoseph@masters-lawgroup.com

## **<u>VERIFICATION</u>**

Under penalties of perjury as provided by the laws of the United States of America and *42 U.S.C. § 1746*, the undersigned hereby certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information, and belief, such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Dated this 27th day of February 2024

/s/ Tori Ann Timmerman
TORI ANN TIMMERMAN

MASTERS LAW GROUP LLC
Anthony G. Joseph, Esq.
Erin E. Masters, Esq.
1900 Spring Rd, Ste 530
Oak Brook, Illinois 60523
Phone : (312) 609-1700
Facsimile : (312) 893-2002
ajoseph@masters-lawgroup.com