**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DUSTIN LEE STAGGERS, | * | CIVIL NO. 3:23-cv-00083-SMR-SBJ |
| | * | |
| Petitioner, | * | |
| v. | * | **REPORT AND** |
| | * | **RECOMMENDATION** |
| TORI ANN TIMMERMAN, | * | |
| | * | |
| Respondent. | * | |
| | * | |

## TABLE OF CONTENTS

I. INTRODUCTION ……………………………………………………………...2

II. PROVISIONS OF HAGUE CONVENTION …………………………………………… 2

III. PETITION BY STAGGERS & RESPONSE BY TIMMERMAN ……………………………… 4

IV. EVIDENTIARY RECORD & FINDINGS OF FACT …………………………………………...5

    A. Stipulations by the Parties ………………………………………………………5
    B. Testimony of Vanessa Kerr - Real Estate Agent ……………………………………… 7
    C. Testimony of Bernardo Espitia - Bus Driver …………………………………………... 8
    D. Testimony of Dustin Staggers – Father ………………………………………………... 9
    E. Testimony of Tori Timmerman – Mother ……………………………………………14
    F. Testimony of Dr. David Finn – Designated Expert Witness by Timmerman ……………18
    G. Testimony of Judge Robert Blink – Designated Expert Witness by Timmerman ……….22
    H. Staggers' Exhibits ………………………………………………………………25
    I. Timmerman's Exhibits …………………………………………………………26

V. ANALYSIS …………………………………………………………………….28

    A. Habitual Residence ………………………………………………………………29
    B. Acquiescence …………………………………………………………………34
    C. Grave Risk ……………………………………………………………………36

VI. CONCLUSION & RECOMMENDATION……………………………………………………40

## I. INTRODUCTION

Dustin Lee Staggers and Tori Ann Timmerman are the biological parents of a minor child, E.L.S., at the center of this matter. They moved with the child from the United States of America to Mexico in March 2023 when the child was almost 6 years old. In November 2023, Timmerman moved with the child back to the United States. Staggers now petitions this Court for the return of the child to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction as implemented by the International Child Abduction Remedies Act. Timmerman opposes the return of the child to Mexico.

The case was referred to this Magistrate Judge for submission of a report and recommendation regarding disposition. A bench trial was held during which Staggers and Timmerman were present and represented by counsel. Dkt. 43, 44. Both parties testified, presented witnesses on their behalf, and submitted exhibits in support of their positions. Dkt. 45, 46. Supporting briefs were submitted prior to trial. Dkt. 27, 28. The matter is considered fully submitted for purposes of this report and recommendation. As set forth below, it is recommended the petition for the return of the child to Mexico be denied.

## II. PROVISIONS OF HAGUE CONVENTION

This action is brought under the Hague Convention on the Civil Aspects of International Child Abduction, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention"). "The Hague Convention 'was adopted in 1980 in response to the problem of international child abductions during domestic disputes.'" *Golan v. Saada*, 596 U.S. 666, 670, 142 S. Ct. 1880, 213 L. Ed. 2d 203 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010)). Over one hundred countries are signatories, including the United States and Mexico. *Id.*; *Vasquez v. Colores*, 648 F.3d 648, 649-50 (8th Cir. 2011).

As explained by the United States Supreme Court, "[i]t is the Convention's core premise

that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72, 140 S. Ct. 719, 206 L. Ed. 2d 9 (2020) (quoting Convention Preamble, Treaty Doc., at 7). In the words of the Court of Appeals for the Eighth Circuit, "[t]he primary purpose of the Hague Convention is "'to restore the *status quo ante* and to deter parents from crossing international boundaries in search of a more sympathetic court.'" *Dubikovskyy v. Goun*, 54 F.4th 1042, 1047 (8th Cir. 2022) (quoted citation omitted). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky*, 589 U.S. at 72. In that regard, Article 3 of the Convention provides as follows:

> The removal or the retention of a child is to be considered wrongful where –
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3.

"Return of the child is, however, a general rule, and there are exceptions." *Golan*, 596 U.S. at 670. For example, pertinent to issues raised in this case, the child's return is not required if the person seeking return "had consented to or subsequently acquiesced in the removal or retention" of the child. Hague Convention art. 13a. The child's return is also not required if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13b.

The United States implemented the Haque Convention by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 9001 *et seq. Golan*, 596 U.S. at 671. The Act

permits a parent "seeking relief under the Convention to file a petition for return of a child in state or federal court." *Id.* (citing 42 U.S.C. §§ 9003(a)–(b)). "Consistent with the Convention, ICARA 'empower[s] courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.'" *Id.* (quoting 42 U.S.C. § 9001(b)(4)); *see also*, *e.g.*, *Tsuruta v. Tsuruta*, 76 F.4th 1107, 1110 (8th Cir. 2023) ("The Hague Convention does not govern custody battles, instead the Hague Convention determines the proper forum for custody battles."); *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) ("The Hague Convention is not designed to resolve underlying custody disputes, but rather to ensure that such disputes are adjudicated in the appropriate jurisdiction."). As summarized by the Supreme Court:

> Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. § 9003(e)(1). If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies. § 9003(e)(2). . . . Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be "promptly returned" to the child's country of habitual residence. § 9001(a)(4).

*Golan*, 596 U.S. at 671-72.

### III. PETITION BY STAGGERS & RESPONSE BY TIMMERMAN

On November 29, 2023, Staggers filed an Amended Verified Petition for Return of Child to Mexico and For Issuance of Show Cause Order (Dkt. 5) pursuant to the Hague Convention and ICARA. Staggers contends Timmerman wrongfully removed their daughter E.L.S. from Mexico to the United States on November 5, 2023. *Id.* ¶ 1. It is indicated Staggers, Timmerman and E.L.S. are citizens of the United States and have temporary Mexican residency. *Id.* ¶¶ 1-3. Staggers claims Mexico is and was E.L.S.' habitual residence when E.L.S. was removed from Mexico. *Id.* ¶ 53. In addition, Staggers claims he has rights of custody of E.L.S. and was exercising his rights when E.L.S. was wrongfully removed. *Id.* ¶¶ 60, 65. Staggers contends he has never consented or

acquiesced to the removal of E.L.S. from Mexico to the United States. *Id.* ¶ 68. Staggers alleges Timmerman's removal of E.L.S. to the United States was wrongful under the Hague Convention and requests an order for the return of E.L.S. to Mexico. *Id.* ¶¶ 66, 72.

In response, on December 21, 2023, Timmerman filed a Verified Answer and Affirmative Defenses. Dkt. 20. Timmerman indicates E.L.S. is currently living in Iowa and denies there was a wrongful removal of E.L.S. from Mexico. *Id.* pp. 4, 14. Timmerman asserts E.L.S.' habitual residence is the United States where E.L.S. has lived for most of her life. *Id.* pp. 17-22. In addition, Timmerman contends Staggers acquiesced to E.L.S.' retention in the United States by agreeing to terms of a Final Protective Order by Consent Agreement-Domestic Abuse (Dkt. 20-1) issued by an Iowa state court on November 27, 2023. Dkt. 20 pp. 26-28. Timmerman also contends there is a grave risk that E.L.S.' return to Mexico would expose E.L.S. to physical or psychological harm or otherwise place E.L.S. in an intolerable situation. *Id.* pp. 23-26. For those reasons, Timmerman maintains Staggers' petition must be denied. *Id.* p. 29.

## IV. EVIDENTIARY RECORD & FINDINGS OF FACT

### A. Stipulations by the Parties

The parties stipulated to the following facts as set forth in a Pretrial Order (Dkt. 39) proposed by counsel and entered by the Court. Staggers and Timmerman met in Louisville, Kentucky in the summer of 2015. They have never been married to each other. In December 2015, they moved to Myrtle Beach, South Carolina. Around September 2016, Timmerman became pregnant. They subsequently moved to Gainesville, Georgia, where the child, E.L.S., was born in 2017. Staggers is the biological father and identified as such on E.L.S.' birth certificate. The parties signed a voluntary acknowledgment of paternity at the time of E.L.S.' birth legally recognizing Staggers as E.L.S.' legal father.

In November 2017, the family moved to Milton, Florida. In April 2019, they moved to

Merida, Mexico. And in March 2020, they stayed with E.L.S.' maternal grandfather and step-grandmother[1] in Donnellson, Iowa. In June 2020, they moved to Tampa, Florida. In August 2021, they moved to New Orleans, Louisiana. And in August 2022, they moved back to Florida.

In March 2023, the family moved into a condo in Mexico City, Mexico. They left the condo in June 2023 and signed a document written in Spanish that constituted a three-year lease for an apartment in Mexico City.

Also, at the outset of the trial, the parties stipulated the United States and Mexico are signatories to the Hague Convention. The parties also stipulated Staggers had rights of custody of E.L.S. under Mexican law and was exercising rights of custody at the time Timmerman and E.L.S. left Mexico for the United States in November 2023.

In addition, while the parties diverge as to the relevancy and impact on the issues, it is undisputed a Final Protective Order by Consent Agreement-Domestic Abuse was issued by an Iowa state court on November 27, 2023 to remain in effect until November 6, 2024. *See* Ex. 2105. The order identifies Tori Timmerman as the petitioner and Dustin Staggers as the respondent, indicates "[t]he parties consent to entry of this order", and sets forth the following provisions agreed to by the parties:

> Therefore, pursuant to Iowa Code Chapter 236, the court ORDERS as follows:
>
> 1.     Respondent is prohibited from contacting Petitioner except through the application AppClose and solely related to the Parties' shared custody of their minor child.
>
> 2.     Respondent shall not communicate with the Protected Party in person or through any means including third persons, except as specified below. This restriction shall not prohibit communication through legal counsel.
>
> 3.     The Court makes no findings of fact.

---

[1] Based upon the evidence at trial, the parties' stipulated facts erroneously referred to E.L.S.' "paternal grandmother and step-grandfather."

4.    Respondent may contact the Parties' minor child daily at 7:00 p.m. and such call should be facilitated through third-party Lonnie Timmerman or Kelly Timmerman.

5.    Respondent is prohibited from traveling to Petitioner's residence or the Parties' minor child's current school.

6.    The Parties' minor child shall remain in the State of Iowa pending further order from a court concerning the ongoing custody dispute.

*Id.*

**B. Testimony of Vanessa Kerr - Real Estate Agent**

Vanessa Kerr resides in Mexico City, Mexico, and lives in the Condesa neighborhood. Kerr owns Peterson Ramero Real Estate and works as a real estate agent.

Kerr first met Staggers and Timmerman at the beginning of 2023 when she helped them find an apartment in Mexico City. This process took four to five months. Kerr knew they were looking for a place for their family and were particularly interested in the popular Condesa neighborhood of Mexico City. Kerr testified Staggers and Timmerman indicated the move to Mexico City was "definitely a long-term move" and they wanted "one stable place."

Kerr sent approximately two dozen options to Staggers and Timmerman, and they went on about eight house tours. To Kerr, it seemed like everybody was on board because they were excited about the move and "everybody was super involved in the process." E.L.S. came with them on house tours and was at the lease signing. Kerr said E.L.S. was an integral part of the process, she was "definitely their main decision-making factor" as they looked for things like closeness to the school, parks and having a walkable neighborhood. Kerr described E.L.S.' demeanor throughout the process as "really very, very sweet and very excited."

After the apartment was chosen, the terms were negotiated. Kerr described the "somewhat lengthy process" of lease signing. A three-year lease was negotiated and signed at a Starbucks in April of 2023. Kerr indicated a three-year lease was desired so the apartment owners would not be

able to change their minds and move back in. Kerr testified all the professionals involved in the process were bilingual, and she worked as the relator and the translator, as all documents were in Spanish. Kerr confirmed she always spoke to Timmerman in English and believed Timmerman understood the process.

Kerr indicated approximately eighty percent of her clients from the United States have businesses in the United States and not very many have businesses in Mexico. She testified a person does not have to relinquish his/her United States citizenship to live in Mexico. Many choose to live in Mexico because it is a beautiful place to live, and the cost of living is much less than in the United States.

## C. Testimony of Bernardo Espitia - Bus Driver

Bernardo Espitia lives in Mexico City and works at his sister's school, the Montessori Del Bosque, as the bus driver. Espitia testified in English.

Espitia first met with Staggers by *Zoom* when Espitia gave Staggers information about the school. Espitia remembers Timmerman appearing in the *Zoom* call and speaking with her. When Staggers and Timmerman came to Mexico, Espitia gave them a tour of the school and they decided to enroll E.L.S. there. Espitia confirmed both Staggers and Timmerman were involved in the decision to enroll E.L.S. at the school. Espitia said Timmerman came to many activities at the school. He remembers Staggers, Timmerman and E.L.S. as always being happy.

Espitia picked up E.L.S. in the mornings to drive her to school. He remembers E.L.S. being a very happy kid, always singing, laughing, making jokes, being a fast learner of Spanish, having lots of friends and hugging a lot. Espitia saw E.L.S. during the day at school as the school had just over 100 students, he would see her in her classroom, at recess and at yoga class. Espitia did not remember E.L.S. having problems at school. He would drive E.L.S. home either just after 2:00 p.m. or at 5:00 p.m. from after-school activities. Usually Timmerman would pick E.L.S. up, but

one to two times a week it could be Staggers. A nanny would also pick E.L.S. up but not often. He recalled E.L.S. jumping into Timmerman's or Stagger's arms.

Espitia said he missed E.L.S. He confirmed Staggers never said he and Timmerman were unhappy with the school. Espitia believes E.L.S. would be welcome back at the school.

**D. Testimony of Dustin Staggers - Father**

Dustin Staggers is the father of E.L.S. He lives in the Condesa neighborhood in Mexico City, Mexico. Staggers met Timmerman, when he owned a few restaurants in Louisville, Kentucky, and she came in for a job interview. All of Staggers' restaurants closed for "various reasons."

Staggers said Timmerman and he "just hit it off", their relationship progressed from there and they moved "a lot." As of 2016, he considered himself and Timmerman to be "nomads." After they had dated three to four months, he asked Timmerman to move with him to the beach. He told Timmerman he could "close the restaurants." Staggers had a tax lien business at that time as well which allowed him to travel and live in areas away from where he would conduct his business. He has three of these businesses all based in the United States.

Between 2016 and 2023, Staggers and Timmerman moved multiple times. Staggers described their plan was to explore by moving to different places with E.L.S. until she was about 7-8 years old. They lived in Myrtle Beach in 2016 until Timmerman became pregnant with E.L.S. From there, in 2017 they moved to Gainesville, Georgia on Lake Lanier just outside of Atlanta and then to Milton, Florida.

At the time E.L.S. was 2 in 2019 they moved to Merida, Mexico. However, shortly after the COVID pandemic began in 2020, they moved to Timmerman's father's home in Iowa. Staggers testified they moved to Iowa to be secluded due to the pandemic. However, after they lived there for a while, they realized they were not as secluded from the pandemic as they desired as

Timmerman's father and stepmother were both going to work each day and having contact with other people.

In June 2020, Staggers and Timmerman decided to move to Tampa, Florida. After residing in Tampa for a period, their condominium building was flooded and no longer suitable. They decided to move to New Orleans in August 2021. Staggers testified he and Timmerman enjoyed living in New Orleans, but their lease expired, and their landlord was not planning on renewing the lease. Although they looked for housing in New Orleans, they could not find a suitable arrangement they could afford.

During this time, Staggers had given a lot of thought as to where they should reside, including moving out of the country. He testified to a phone conversation with Timmerman where he proposed they move to Mexico City. As such, he, Timmerman and E.L.S. travelled to Mexico City and spent 10-11 days there, exploring the neighborhood where they eventually moved, and two other neighborhoods nearby. As a result of this visit, they decided they would sell their belongings and move to Mexico City. However, their lease was up in New Orleans in July, a major work season for Staggers was October to November and E.L.S. needed to begin school in August. Due to this and because his brother/friend had a home available to them in Pensacola, Florida, Staggers, Timmerman and E.L.S. moved there to allow E.L.S. to begin school and for them to plan their move to Mexico City.

Ultimately, they moved to Mexico City with E.L.S. on March 1, 2023. Staggers believed Timmerman was happy with the decision to move to Mexico City. However, after the move to Mexico City, their relationship broke down. Staggers said the relationship "wasn't in the best place it's been for us." At one point, when Timmerman travelled to Louisville from Mexico City to visit her sick brother, Staggers told her to stay with her family in Louisville. He even cancelled Timmerman's return plane ticket. Staggers also criticized Timmerman's spending habits while she

was in Louisville and told her to get a job.

Staggers admitted he and Timmerman have had physical altercations with each other, one occurring in August 2022 and another in December 2022. He admitted to giving Timmerman black eyes. He testified Timmerman smashed a bottle over his face during one incident and in another she had kicked him while they were in bed. He also assumed marks on her chest in photos admitted as exhibits were from him as well. He admitted to causing the injuries depicted in photos attached to Timmerman's petition for the protective order in Iowa state court. Staggers testified he had not been in any fights with other people in Mexico but acknowledged fighting someone on October 28, 2023. Staggers denied he has physically harmed or verbally abused E.L.S. and does not believe he is a danger to E.L.S. Staggers acknowledged he may have had some "foul words" with Timmerman's father the week before the trial.

Staggers testified to what he believes was excessive drinking by Timmerman. He discussed an incident reflected in text messages between E.L.S.' nanny and Staggers one evening. He indicated he and Timmerman had been out and, after returning home, Timmerman went back out unbeknownst to him. He testified Timmerman had fallen asleep on the street and passersby found her and called an Uber to take her home. Staggers also testified to an incident when he claimed Timmerman had too much to drink, was trying to use the oven in their apartment and kicked the oven door closed, causing it to shatter. He also testified about an incident he said occurred when she caused a scene at a bar, causing her to be banned from going back to the bar. Staggers testified he has had conversations with Timmerman's father and stepmother about getting treatment for her.

On November 3, 2023, Staggers was out of town working in the United States and could not get in touch with E.L.S. to say good night to her as he always does. So, he turned on cameras installed in the apartment in Mexico City, overhearing a conversation between Timmerman and her stepmother on the phone discussing taking E.L.S. out of the county. He said her stepmother

said something about killing him. Staggers sent a text message to Timmerman suggesting she should not kill him but, rather, should have a conversation like adults regarding the best interest of E.L.S. There was no response from Timmerman.

Staggers tried to communicate with Timmerman the next day by text, but she did not respond. He was able to talk to E.L.S. and described her as "being very weird." Staggers said the next day he continued to try to reach Timmerman, but the messages went "green", so he thought she was on an airplane or had blocked his phone number. He had a few of his friends call and text Timmerman to see if their texts went "green" as well and they did, suggesting to him that Timmerman was on a plane. Staggers got on a flight to go back to Mexico City to find out what was going on.

Staggers' initial plan was to get a hotel room in Mexico City and wait to see if E.L.S. got on the school bus the next Monday. However, a friend met Staggers at the airport in Dallas and told him Timmerman had brought E.L.S. back to the United States. When Staggers arrived back at the apartment in Mexico City, he found it empty. The doorman said Timmerman and E.L.S. left early in the morning of November 5th around 3:00-3:30 a.m.

The next day, Staggers went to the United States Consulate in Mexico and found out about the Hague Convention. Staggers then learned Timmerman petitioned for an emergency protective order against him, so he retained Iowa counsel to work on the Hague Convention issue and the emergency protective order. Staggers said he was never served with the emergency protective order. He testified he agreed to language in the Final Protective Order by Consent Agreement that provided for E.L.S. to stay in Iowa because he was concerned Timmerman might move E.L.S. again and with this provision, he would know where she was. Staggers explained he signed the consent decree on advice of his counsel and emphasized the Hague Convention petition was filed the next day. Staggers also hired a lawyer in Mexico and discussed several court filings made for

him in Mexico City. There were some emergency relief measures to affirm his parental rights in Mexico and Staggers testified the claim was dismissed because "[t]hey wanted this in a different court – in a different court venue, one that's similar to what we are in currently here."

Due to the provision in the state of Iowa order, Staggers is allowed to speak to E.L.S. daily. Staggers said these calls can be emotional. Staggers testified E.L.S. has said she wished Timmerman had not taken her, she has seen her grandpa punch a hole in a wall and her grandma being mad at her. Staggers recalled a conversation when E.L.S. said she had an allergic reaction to pizza and had "a giant welt" on her face. Staggers has seen E.L.S.' diary which has pictures of broken hearts and pictures of them walking around.

Staggers described E.L.S. in general as "very lovey, huggy, bubbly, sweet, kind, empathic, fun to be around, a little rambunctious with all those qualities, but she's amazing." Staggers agreed "1000 percent" E.L.S. can make friends easily. Staggers grew up around "a lot of different races of people" and wanted that for E.L.S. Staggers acknowledged there was a language barrier for E.L.S. in Mexico, but she was being tutored and was picking up Spanish. He believed learning Spanish was beneficial for her life and not a negative. He said she is "really good" at directions in Mexico City. Several pictures of E.L.S. were discussed as a part of Staggers' testimony. He described his relationship with E.L.S. as "awesome."

Staggers wants the Court to order E.L.S. returned to Mexico and he said, without question, he is willing to come back to the area to take her to Mexico. His position is the Hague Convention indicates Timmerman should fund the transfer, but the funding is not his main concern. He just wants E.L.S. back.

Staggers testified his home is Mexico. He thought Mexico City was where the family would stay and discussed renewing residency. He, Timmerman and E.L.S. all sought and received a one-year, temporary residency. Staggers indicated you first apply for the one-year residency, and, at

the expiration of that year, you can then apply for a three-year residency. He applied and received a three-year residency, but Timmerman and E.L.S. have not because they had returned to the United States before the expiration of their one-year residency.

All of Staggers' financial institutions, post office box and work are in the United States. He files taxes in the United States. He does not own a car in Mexico because he does not need one.

**E. Testimony of Tori Timmerman - Mother**

Tori Timmerman is the mother of E.L.S. She is twenty-eight years old. She and E.L.S. live in Donnellson, Iowa with Timmerman's father and stepmother. Timmerman's home and legal address is Donnellson, Iowa. Timmerman graduated high school and has a certification as a community health worker.

Timmerman is a United States citizen and does not speak, write, or read Spanish. She said E.L.S. does not speak Spanish and she and Staggers would speak to E.L.S. in English when they lived in the United States and in Mexico. Over the last ten years, Timmerman has only paid taxes in the United States. Her driver's license is from the state of Iowa. She has not had a driver's license in a foreign county but does have a passport. She has no financial accounts in Mexico.

Timmerman met Staggers in Louisville, Kentucky at one of his restaurants in 2015/2016. She was 20 years old at the time and Staggers was 33 years old. A relationship developed and they moved in together after a few months into a place Staggers rented. They then moved to various places as Staggers' restaurants were failing and his reputation had "gone down the drain." Each time they would move, they would sell their things and move with a few suitcases. Timmerman noted she would oversee selling items on Facebook marketplace each time they moved. She confirmed they moved to Myrtle Beach, South Carolina in 2016, Gainesville, Georgia in late 2016/early 2017, where E.L.S. was born, then to Milton, Florida, to Merida, Mexico in 2019, to Iowa, New Orleans, then Pensacola, Florida and to Mexico City, Mexico in 2023. She testified no

place they have ever lived was permanent.

Timmerman was a stay-at-home mom but has worked at a few serving jobs as they moved. She said Staggers would tell her to get a job as a form of punishment, but she never had a problem working. According to Timmerman, if she did not do what Staggers said, there would have been "consequences" for her, so she tried to keep the peace.

In April 2023, Timmerman and Staggers signed a three-year lease for an apartment in Mexico. She said they signed a three-year lease because it was the best value. She believed if Staggers wanted to break a lease he would find some way to get out of it. Initially, Timmerman was excited to move to Mexico until the "newness of the move wore off." She admitted, however, in July 2023, she texted her friend Cherie that she loved Mexico and missed Staggers as he was out of town. Timmerman agreed E.L.S.' private Montessori school in Mexico was expensive. She acknowledged E.L.S. took skating lessons, she had a nanny two days a week to help with E.L.S. and a cleaning lady one time a week. Staggers paid for all of these with his businesses in the United States. Timmerman agreed they never went without food and were able to go to bars.

Timmerman testified Staggers was talking about buying a place back in the United States. She and E.L.S. had temporary Mexico visas but did not reapply for them as she did not believe they were staying in Mexico long term. She testified, when they moved to Mexico in 2023, she did not intend it to be a permanent move, as "nowhere we've ever lived has ever been permanent based off of our eight-year relationship."

Timmerman described troubles she had with her relationship with Staggers. When she was Louisville visiting her sick brother, Staggers cancelled her plane ticket back to Mexico City. Timmerman also noted messages she received from Staggers when he was upset about something and indicated to her that he would be "less mad if you got gang banged on my mattress." Timmerman said this was a "pretty frightening vision." Timmerman also testified as to incidents

of physical violence by Staggers which included black eyes, pushing her, kicking a shower door, throwing cigarette butts at her, pulling her hair out, ripping her necklace off, choking her, and leaving marks on her face and neck. Timmerman testified Staggers had sexually abused her as well as physically and verbally abusing her. She took pictures of some of her injuries. Timmerman admitted to hitting Staggers over the head with a bottle while he was sleeping. She was terrified to leave Staggers at that point after the altercation resulted in black eyes and marks on her neck. Timmerman said she did not call the police in Mexico because she did not speak Spanish.

According to Timmerman, E.L.S. would hear Staggers and Timmerman yelling and ask her about her injuries. Timmerman would hide in E.L.S.' bedroom and Staggers would come to the door and say that he knew where she was. She stated that, at the end, the abuse was so bad and she was convinced she would not be believed about it.

While Timmerman knew a camera was in E.L.S.' bedroom, she did not know about other cameras in the house and that Staggers was watching her. According to Timmerman, the first time Staggers indicated he was watching her on the cameras was November 3, 2023, when he could not reach her.

On November 5, 2023, Timmerman and E.L.S. left Mexico for the United States because she "was not safe whenever [Staggers] was home" and even when he was not home, she now knew she was being watched and controlled. She indicated Staggers had her terrified and under his control.

On November 6, 2023, Timmerman filed for an emergency protective order in Iowa state court. Timmerman understood minor children cannot be put on the order but E.L.S. is protected since her mother is on the emergency protective order. She said the lawyers worked out the provisions in the consent decree. It is her understanding such provisions include Staggers being able to speak with E.L.S. and keeping E.L.S. in Iowa pending a further order of the court

concerning the ongoing custody dispute.

The week prior to the trial, Staggers sent messages to Timmerman's father Lonnie. Timmerman thought the reference to a "family reunion" in those messages was meant to scare her and her family. She thought "bury you" referred to coming to her parents' property to hurt her family. Timmerman said when she heard about the messages, she immediately came home from work, warned her neighbors, and locked the windows.

Timmerman recounted Staggers had done cocaine, smoked marijuana and drank large amounts of alcohol resulting in him being gone for hours and then coming home erratic. Timmerman testified Staggers sent messages about "bumps" which refers to doing cocaine. She talked about a picture in evidence showing Staggers sleeping with cocaine coming out of his nose. Timmerman said she does not use cocaine to the extent Staggers does. Timmerman admitted to using marijuana recreationally in the past, but testified she does not do so now and is not proud of using it. Timmerman also admitted to drinking in Mexico. She considers herself to be a good mother and is not an alcoholic.

Timmerman testified she is afraid E.L.S. would face "even more psychological harm" from Staggers if the Court orders E.L.S. to go back to Mexico. Timmerman is afraid Staggers would do physical violence to E.L.S. as she and E.L.S. act the same. Timmerman testified she has witnessed Staggers hitting E.L.S. and that he has verbally abused E.L.S, but acknowledged she testified she has never seen Staggers hit E.L.S. in a prior deposition. Timmerman explained things are now coming back to her due to her time to reflect.

Timmerman noted text messages from October 22, 2023, in which Staggers writes "[h]ey, I mean I've smacked her before." Another set of messages from July 21, 2023, reference "I didn't enjoy doing that, but her mouth is getting out of control. I needed to rein that in a smidge." Another message reads "I think she got it because she caught a little lick for sure. Hard for her." Timmerman

said these messages reference Staggers hitting E.L.S. and are consistent with what she has personally observed.

Timmerman agreed E.L.S. can be a frustrating child. She acknowledged a text message to Staggers about E.L.S. in which she wrote "[i]'m sorry she's an asshole; I want to punch her in the face, if that makes you feel any better." Timmerman admitted it is not good parenting to say something like this. When questioned, Timmerman did not recall slapping E.L.S.'s thigh, grabbing her arm, hurting E.L.S. and then apologizing for doing these things.

Timmerman believes Staggers to be a violent person as he had sent other messages to her about wanting "to get the fight out of his soul" and wanting "to fuck people up." She said it was not shocking to her that Staggers was picking fights with random people and fighting with her.

## F. Testimony of Dr. David Finn – Designated Expert Witness by Timmerman

Dr. David Finn is a psychologist in private practice focused on forensic assessments. He has a bachelor's degree from Loyola University in Chicago in psychology, a master's degree in counseling from Bradley University and a master's degree and doctorate in clinical psychology from the Illinois School of Professional Psychology. Dr. Finn has taught classes at Roosevelt University and is an adjunct professor at the Adler School of Professional Psychology. He also trains clinical interns in his practice. Dr. Finn has spoken at presentations for bar associations for attorneys and judges on issues related to family law including domestic violence, parenting time plans, parental alienation, and other related areas.

Dr. Finn's practice focuses on conducting assessments mostly for family courts involving divorces and custody cases. He also conducts risk assessments and Hague Convention case assessments. In a Hague Convention assessment, he evaluates the exceptions that a parent has raised regarding a child being returned, including as to grave risk. He has conducted approximately 600-700 family evaluations.

For this case, Dr. Finn conducted forensic interviews of Timmerman, E.L.S. and a collateral interview of Timmerman's stepmother. As explained by Dr. Finn, when he interviews friends and family, their statements are usually supportive of the person, so he would not be surprised if Timmerman's stepmother had a bias to protect Timmerman, but that does not mean the stepmother's statements were incorrect. Dr. Timmerman also reviewed documents including both parties' deposition transcripts, 500-600 pages of text messages between Timmerman and Staggers and other documents from the exhibit list which were provided to him by Timmerman and/or her attorney. Dr. Finn did not interview Staggers as Dr. Finn believed he had enough information as to Staggers' conduct from his own words in the transcripts and text messages. Dr. Finn indicated he did not perform a parenting capacity assessment; however, he did assess parenting capacities within the context of this Hauge Convention proceeding.

During Timmerman's forensic interview, Dr. Finn talked to her about her background, the history of her relationship with Staggers and her allegations of domestic violence by Staggers. He found Timmerman's statements about abuse to be consistent with the statements she set forth in her petition for a protective order in Iowa state court. According to Dr. Finn, Timmerman appeared distressed when describing the domestic violence, and cried at points when she talked about the violence she endured during the relationship with Staggers. Based on the clinical interview and the other information he was provided, it was the opinion of Dr. Finn within a reasonable degree of psychological certainty Timmerman was telling the truth. He found no contraindications and determined what Timmerman had discussed with him was consistent with the other information in the case. Dr. Finn explained, when he performs an evaluation, he does not take anyone's word at "face value" but corroborates their statements with other information he has available.

Dr. Finn conducted a clinical interview of E.L.S. via video conference in February 2024 with E.L.S. present in Timmerman's parents' house. Timmerman's stepmother set up the

connection for the video and then walked away. Timmerman was not present. Dr. Finn testified E.L.S. was "very bubbly, very enthusiastic" while they discussed her friends, school, and things she enjoys doing. However, when Dr. Finn started to talk about the family, he "noticed a real shift here with E.L.S.'s affect, with her mood." According to Dr. Finn, E.L.S. said she had been woken up by Staggers and Timmerman fighting. E.L.S. also told Dr. Finn she heard Staggers say Timmerman would not be a part of the family anymore. E.L.S. then said she did not want to talk about it anymore. According to Dr. Finn, this would be terrifying for a child who has a mother as a partial if not full primary caregiver. Dr. Finn did not ask E.L.S. about her thoughts of not seeing Staggers since November 2023.

When Dr. Finn asked E.L.S. if she had seen "owies" on Timmerman, E.L.S. again said she did not want to talk about this. Dr. Finn explained there are many adverse effects to a child living with domestic violence in the home including cognitive, academic, social, and behavioral consequences. Dr. Finn ended the interview because of E.L.S.' withdrawal and noted the withdrawal was clinically significant because Dr. Finn was asking about "some very painful experiences in her life."

From his assessment, it is Dr. Finn's opinion to a reasonable degree of psychological certainty that the relationship between Staggers and Timmerman contained coercive controlling domestic violence, with Staggers as the perpetrator and Timmerman and E.L.S. the victims of that violence.

Dr. Finn noted text messages between Staggers and Timmerman contain threats by Staggers to isolate Timmerman and her family, statements to Timmerman's dad about Timmerman being dangerous, statements by Staggers about being mad at Timmerman and seeing her violently sexually assaulted, and Staggers' threats to Timmerman's father the week prior to this trial. Dr. Finn also found significant Staggers telling Timmerman she is a bad mother, she is a psychopath,

and she ruined things for them in Mexico. Also significant were Staggers' actions in keeping Timmerman away, telling her to pack her things and leave, that if she wants to come back she could earn money and find a place to live and that he was going to raise E.L.S. Of further significance to Dr. Finn were Staggers' statements to Timmerman that E.LS. was better being raised without Timmerman, and Timmerman could try fighting him for E.L.S. but she would not win. Finally, Dr. Finn noted Timmerman's statements about physical injuries and Staggers' admission to hitting Timmerman are corroborated with pictures that showed "some pretty severe physical violence."

As to the opinion E.L.S. was a victim of Staggers' violence, Dr. Finn noted E.L.S. was present when the violence against Timmerman was occurring and saw Timmerman injured. In addition, E.L.S. heard Staggers say Timmerman was not going to be a part of the family. Dr. Finn also noted E.L.S. was in Mexico when Staggers cancelled Timmerman's return airplane ticket, although Dr. Finn did not know what questions E.L.S. had about this or what explanations were given to E.L.S. about why Timmerman was not returning. It was further noted that Staggers admitted to hitting E.L.S. and used words consistent with coercive control like "she deserved it", "he was going to teach her a lesson", and "I'm glad she felt bad." Dr. Finn also referred to a text message from Staggers to Timmerman that if E.L.S. does not do what he wants he will "fuck her up." In Dr. Finn's opinion, based upon a reasonable degree of psychological certainty, if the court ordered E.L.S. to be returned to Mexico either physical abuse or psychological abuse would be promulgated on E.L.S. in the future and, consequently, E.L.S. would be subject to grave risk if she were returned to Mexico.

Dr. Finn also noted text messages between Staggers and Timmerman in which Staggers discussed physical altercations he has had with other people. In Dr. Finn's opinion, the texts are inconsistent with Staggers' deposition testimony explaining he was defending himself in those

21

incidents. From Dr. Finn's reading of the texts, Staggers seemed proud of "knocking this guy's teeth out." And in Dr. Finn's view, this sends a clear message about what Staggers is capable of doing when he is upset.

Dr. Finn did not find Timmerman had a substance abuse problem. He was aware of the text message from a stranger about Timmerman on the streets of Mexico passed out and taking an Uber back to the house, but this one text message did not make Dr. Finn think Timmerman had a substance abuse problem. Dr. Finn acknowledged he did not review text messages between Timmerman's father and Staggers about having Timmerman committed in the United States for her substance abuse problems. Dr. Finn testified this information would have been important but would not have made his clinical assessment different in the context of the Hague Convention grave risk assessment. Dr. Finn explained an alcohol assessment of Timmerman would be used in a parenting capacity assessment but not in the context of the grave risk assessment in returning E.L.S. to Mexico.

Dr. Finn emphasized children require a safe and healthy relationship with both of their parents. In Dr. Finn's opinion, when E.L.S. was taken away from the abuse, not exposed to abuse, it would be a positive effect on her mental health but being away from her father would be difficult/stressful for her. Dr. Finn believes parents should take responsibility when they mistreat their children. If a parent hits a child, then apologizes for it and shows some empathy, Dr. Finn opined it would be an overall positive.

**G. Testimony of Judge Robert Blink – Designated Expert Witness by Timmerman**

Judge Robert Blink graduated from Drake University law school in 1975. He practiced law until 1995 and was then appointed to the Iowa state district bench. He retired in November 2017 but continued as a senior judge until he completely retired in November 2023.

Judge Blink spent three years specifically assigned to the family law administrative bench.

The duties included presiding over all pretrial matters in family law cases, such as proceedings under Iowa Code Chapter 236 which authorizes protective orders for domestic relationships. Judge Blink explained there must be a petition filed pursuant to under Chapter 236 requesting relief from domestic abuse. Typically, only one party is present for the hearing for the temporary protective order which is issued if there is a sufficient factual basis. For a factual basis, there are two components. First, there must be a statutory relationship recognized between the parties. Second, there must be an assault as defined under Iowa statutory law. A hearing date is then set anywhere from five to fifteen days out. The other party is served with the temporary protective order and the order for hearing.

Judge Blink explained that, in this case, the temporary protective order would have included the terms of protection and notified Staggers of the general claims against him as well as informing him about the date of the hearing. The temporary protective order would go into effect at such time as Staggers was served with it. If there is proof the other party has been served and they do not appear/respond, the court can enter a final protective order. Otherwise, a hearing is held in which the court has an opportunity to hear from both parties. Judge Blink explained the concept of fundamental fairness is that a person has an opportunity to speak on his/her own behalf. If the court finds domestic abuse has occurred, then a protective order is put in place for one year.

As further explained by Judge Blink, if the parties agree that a protective order should be entered, then the court will do so by consent. If the parties consent, the court does not entertain evidence and does not make any finding that domestic abuse occurred. According to Judge Blink, this can be critical because the parties can be amid dissolution proceedings or custody battles and if the court finds domestic abuse has occurred it could raise an adverse inference against the party. The overriding concern is that the proposed terms ensure safety of the party who has alleged the abuse and the best interest of the child. If the parties consent, they can agree to a protective order

for less than one year. The hearing judge can enter any terms that will be in the best interest of the aggrieved party and children.

Judge Blink reviewed the Final Protective Order by Consent Agreement entered by the Iowa state court on November 27, 2023. In the view of Judge Blink, the judge's signature on the order indicates the judge was satisfied Staggers consented to the terms in the agreement. Judge Blink indicated it is "not at all uncommon" to have a provision about a minor child remaining in the state of Iowa pending further order from a court concerning an ongoing custody dispute such as in this case. Judge Blink explained the most critical issues for judicial determination are continuity, consistency, and a safe environment for the child.

In regard to the provision in the order for Staggers to have contact with E.L.S. daily at 7:00 p.m., Judge Blink opined such language indicates Staggers agreed his contact with E.L.S. would be limited to daily contact monitored by a third party until the ultimate resolution of the custody dispute. In Judge Blink's view, this demonstrates Staggers consented to not having the child in his custody and not having personal parenting time with the child. Judge Blink believes contact with "the other parent" should be fostered, but in domestic violence situations this can expose a child to a situation that is not healthy for them.

Judge Blink acknowledged E.L.S. is not listed as a protected person in the final protective order and the order does not provide for physical parenting time. From Judge Blink's thirty years on the bench, the best way to make appropriate care provisions for a child is through a dissolution decree that described physical care and legal custody or a custody order for unmarried parties. He did not agree that a protective order is an incorrect venue for establishing custody or care issues for a minor child and explained it was a question of options. If there was not another type of order to establish rights between Staggers and Timmerman regarding E.L.S., the final protective order would be the only way to control this issue.

24

Judge Blink testified, in his view, the order constituted a showing that both Staggers and Timmerman agreed that any future child custody proceedings would be continued in the state of Iowa. Judge Blink indicated findings and orders under Chapter 236 would take precedence over orders relating to parenting time and custody that are otherwise established in a dissolution decree or other type of custody order. This is because the primary focus of a Chapter 236 order is to maintain physical safety and nonviolence which remains in effect until the Chapter 236 order expires, is dismissed, or otherwise rendered null and void.

**H. Staggers' Exhibits**

The Court has reviewed the exhibits offered by each party which are herein described in summary form. Staggers submitted exhibits 1001-1054 to which there were no objections and therefore received by the Court. Dkt. 45 pp. 1-3.

Exhibits 1001-1026 consist of photographs taken between April 16, 2019, through August 24, 2023. The photographs show various activities involving Staggers, Timmerman and E.L.S. including general family photos, pictures involving E.L.S.' school and activities in E.L.S.' life.

Exhibits 1027-1030 are various documents for temporary residency in Mexico for Staggers, Timmerman, and E.L.S.

Exhibits 1031-1035 are documents filed in Mexico regarding custody rights. Some documents are in English, and some are in Spanish.

Exhibits 1036-1046 include various messages and conversations through I-message, texting, WhatsApp and Instagram. The messages include Timmerman apologizing for blacking out and Staggers telling Timmerman she is not a good mom. Other messages include "Caty", Lonnie, and Sofia the nanny talking about Timmerman. There are messages from Timmerman talking about living in Mexico City.

Exhibit 1047 shows receipts from March through November of 2023 paying for E.L.S.'

schooling at Montessori del Bosque. All the documents are in Spanish.

Exhibits 1048-1054 are videos of E.L.S. in various activities from the family arriving in Mexico in 2023 through September 14, 2023.

**I. Timmerman's Exhibits**

Timmerman submitted exhibits 2000-2113 to which there were no objections and therefore received by the Court, except for exhibits 2111 and 2112 which were received over objections by Staggers. Dkt. 45 pp. 4-12.

Exhibits 2000-2001 are pleadings filed in this case.

Exhibits 2002-2007 include Timmerman's identification documents – a temporary driver's license, passport, birth certificate, social security card, Florida driver's license and high school transcript. Exhibits 2008-2009 include Staggers' identification documents – a birth certificate and a temporary residency card for Mexico. Exhibits 2010-2012 are E.L.S.' identification documents – a birth certificate, passport and social security card.

Exhibit 2013 is a fifty-two second video of E.L.S. saying her dad and uncle were drunk and asking for people to give the video a thumbs up.

Exhibits 2014-2027 are various documents showing E.L.S.' different schools from November 2021 through 2024. The documents deal with financial aid, a reading program, and progress reports.

Exhibits 2028-2032 consist of various documents showing health care coverage from Iowa Medical Assistance, Ambetter and United HealthCare, a chart of absent days from school and enrollment letters.

Exhibits 2033-2040 are documents regarding various residences in the United States.

Exhibits 2041-2049 include pictures of a credit card, and various documents showing bank accounts and credit cards of Timmerman, pictures of a US Bank credit card with Timmerman's

name on it, a letter from Synchrony Bank regarding a Verizon credit card, and letters from Chase Bank about an invalid credit card and showing an account was closed. Also included are bank statements from Lee County Bank and Two Rivers Bank & Trust for Timmerman showing a balance of $5.03, a letter from TransUnion about a credit freeze, a document concerning a security freeze on Timmerman's Equifax credit report and a message from Timmerman about Staggers using her credit cards. Exhibits 2050-2054 show various payments made by Timmerman for insurance and Apple. The Apple documents deal with AppleCare+ and Apple products.

Exhibits 2055-2059 consist of emails, pictures, and proof of financial responsibility for vehicles of Staggers and Timmerman.

Exhibits 2060-2068 are itineraries from Southwest and American Airlines for Staggers, Timmerman, and E.L.S. from 2016 through 2023.

Exhibits 2069-2071 are documentation of medical assistance for Timmerman, Medicaid for E.L.S., health insurance and coverage for Timmerman and benefits for Timmerman.

Exhibits 2072-2092 are documents showing Staggers' business activities, including articles of organization, limited liability company annual reports, business details, emails regarding a broken washing machine, and news articles related to Staggers and Timmerman. Also included are screenshots of Staggers' social media accounts with LinkedIn and Instagram, conversations and payments to "Sensational Selene" and "SexxySeven77", two pictures of Staggers laying down with a white substance in his right nostril and a video of Staggers saying, "New Phone, who this."

Exhibits 2093-2098 are conversations between Staggers and Timmerman on platforms such as iMessage and WhatsApp. The conversations include pictures of other people's children, Staggers' head and face tattoos, a video, area maps, pictures of a building, food, sandals for a girl and household items. There are messages between Staggers and Timmerman indicating a loving relationship and messages indicating Staggers believes Timmerman is not being responsible and

this affecting their relationship. There are messages about cancelling Timmerman's flight home. There are messages from Timmerman discussing getting help for her drinking. The final messages are Staggers asking Timmerman how she could kidnap their child.

Exhibits 2099-2105 consist of information regarding domestic violence between Staggers and Timmerman, including the Petition for Relief from Domestic Abuse and Temporary Protective Order from November 6, 2023 and the Final Protective Order by Consent Agreement dated November 27, 2023. There is a seventeen second video showing Timmerman's hair, left arm and left side of her neck.

Exhibits 2106-2109 are a will and health care directive for Staggers, Timmerman, and E.L.S. Staggers' will is not signed. The documents are filled in but not signed.

Exhibit 2010 is a nine second video showing injuries to Timmerman. The video shows a hand holding hair in a clump located on a sink.

Exhibit 2111 are text messages between Staggers and Timmerman's father.

Exhibit 2112 is the curriculum vitae of Dr. Finn. Exhibit 2113 is the curriculum vitae of Judge Blink.

## V. ANALYSIS

In general, the Hague Convention "'requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States.'" *Rodriguez v. Molina*, 96 F.4th 1079, 1082 (8th Cir. 2024) (quoting *Chafin v. Chafin*, 568 U.S. 165, 168, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013)). As the petitioner, Staggers bears the burden of establishing, by a preponderance of the evidence, "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). To do so, Staggers must prove the following: "First, he must show [Mexico] was [E.L.S.'] habitual residence prior to removal . . . . Second, he must show

the removal of [E.L.S.] violated his custody rights under [Mexican] law. Third, he must show he

was exercising his parental rights before [E.L.S.] was removed." *Tsuruta*, 76 F.4th at 1110; *see*

*also Dubikovskyy*, 54 F.4th at 1047 (setting forth same requirements for child's return under

Convention and ICARA); *Custodio v. Samillan*, 842 F.3d 1084, 1088 (8th Cir. 2016) (same);

*Barzilay v. Barzilay*, 600 F.3d 912, 917 (8th Cir. 2010) (same).

As previously noted, the parties stipulated Staggers had rights of custody of E.L.S. under

Mexican law and was exercising those rights of custody at the time Timmerman and E.L.S. left

Mexico for the United States in November 2023. It remains for Staggers to prove by a

preponderance of the evidence Mexico was E.L.S.' habitual residence prior to removal. If able to

do so, "[w]rongfully removed or retained children 'are to be promptly returned unless one of the

narrow exceptions set forth in the Convention applies.'" *Rodriguez*, 96 F.4th at 1082-83 (quoting

22 U.S.C. § 9001(a)(4)); *Custodio*, 842 F.3d at 1089 (same).

As raised by Timmerman in this case, returning E.L.S. to Mexico is not required if Staggers

"subsequently acquiesced in the removal or retention" of E.L.S. in the United States. Hague

Convention Art. 13a. The acquiescence exception must be proven by a preponderance of the

evidence. 22 U.S.C. § 9003(e)(2)(B).

As additionally raised by Timmerman, the return of E.L.S. to Mexico is also not required

if "there is a grave risk that [E.L.S.'] return would expose [E.L.S.] to physical or psychological

harm or otherwise place the child in an intolerable situation." Hague Convention Art. 13b. The

grave risk exception must be proven by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

**A. Habitual Residence**

Neither the Hague Convention nor ICARA defines the term "habitual residence." *Monasky*,

589 U.S. at 76, 87. But according to the Supreme Court, a child's "residence in a particular country

can be deemed 'habitual' . . . only when her residence there is more than transitory." *Id.* at 76. It

is "a fact-sensitive inquiry" and "depends on the totality of the circumstances specific to the case." *Id.* at 71, 77. It "does not turn on the existence of an actual agreement" between the parents as to where to raise their child. *Id.* at 76. "What makes a child's residence 'habitual' is . . . 'some degree of integration by the child in a social and family environment.'" *Id.* at 77 (quoted citation omitted). "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id.*

In making this determination, "courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 78 (quoted citation omitted).

> For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant. Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases. Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence. But suppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus.

*Id.* Facts which courts have considered include the following:

> "a change in geography combined with the passage of an appreciable period of time," "age of the child," "immigration status of child and parent," "academic activities," "social engagements," "participation in sports programs and excursions," "meaningful connections with the people and places in the child's new country," "language proficiency," and "location of personal belongings."

*Id.* n. 3 (quoted citation omitted). As further explained:

> the concept of habitual residence for a child too young to acclimatize cannot be reduced to a neat set of necessary and sufficient conditions. Answering the question of what is customary or usual, for instance, requires judges to consider a host of facts, such as the presence or absence of bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties. Determining whether there is a residence involves the consideration of factors such as the presence or absence of a permanent home, the duration in the country at issue, and, in some cases, an actual agreement between the parents to reside in a particular place.

*Id.* at 88 (Thomas, J., concurring in part and concurring in judgment). The habitual residence has been characterized as "the place where a child is at home" which is a "multifaceted" concept requiring "a heavily factual inquiry." *Id.* pp. 77, 91-92 (Alito, J., concurring in part and concurring in judgment).

Similarly, the Eighth Circuit describes the "determination of habitual residence under the Hague Convention [as] a fact intensive inquiry particularly sensitive to the perspective and circumstances of the child." *Barzilay*, 600 F.3d at 920.

> Habitual residence is determined as of the time "immediately before the removal or retention" and depends on "past experience, not future intentions." *Silverman v. Silverman*, 338 F.3d 886, 897-98 (8th Cir. 2003) (en banc). Habitual residence encompasses "some form of settled purpose" but only requires that "the family ... have a sufficient degree of continuity to be properly described as settled." *Id.* at 898 (quotation omitted). However, "[t]his settled purpose need not be to stay in a new location forever." *Id.* The Eighth Circuit determines settled purpose "from the child's perspective, although parental intent is also taken into account." *Id.* That said, parental intent need not be completely clear, *see Barzilay*, 600 F.3d at 918, and "one spouse harboring reluctance during a move does not eliminate the settled purpose from the [child's] perspective," *Silverman*, 338 F.3d at 899. In addition to settled purpose and parental intent, relevant factors include "the change in geography, the passage of time, and the acclimatization of the child to the new country." *Stern v. Stern*, 639 F.3d 449, 451 (8th Cir. 2011) (quotation omitted).

*Cohen v. Cohen*, 858 F.3d 1150, 1153 (8th Cir. 2017).

Here, Staggers contends he "has a clear-cut prima-facie case that [E.L.S.] was a habitual resident of Mexico at the time of her removal by [Timmerman]." Dkt. 28 p. 10. In support, he sets forth the following summary in his brief:

> It is undisputed between the parties that since the child's birth, they have resided together as a family and moved frequently. The child resided in Merida, Mexico with her parents from April 2019 through March 2020. Once the borders began to shut down, the parties moved to the United States so that [Staggers] did not have any issue maintaining his business located in the United States. Since the birth of the child in 2016, [Timmerman] has struggled with alcohol abuse issues and emotional and violent outbursts directed at [Staggers] and the child. In March 2023, the parties and their daughter moved to Mexico City, Mexico with the idea that it would be a "fresh start" for the family and a chance to raise their daughter in a place that they both loved. The parties sold all of their belongings in the United States

and moved into a condominium in Mexico City. The parties entered into a three-year lease for their condominium and furnished the home after the move. Before moving, the parties established with the Mexican Embassy in the United States that they would be remaining in Mexico on a long-term basis and started the process to obtain residency in Mexico. After moving to Mexico City, the parties finished the process and the parties, and their daughter became temporary residents of Mexico City. Obtaining temporary residency is the first required step to become permanent residents of Mexico. The parties' child immediately started in a school the week after the move and attended the school until she was wrongfully removed from her home by [Timmerman]. The child attended extracurricular activities in Mexico, attended social events with her family and friends and was learning Spanish. The parties had no plans to return to the United States or raise their daughter in the United States.

*Id.* pp. 4-5. Staggers insists "[i]t is clear that [E.L.S.] was residing, with an intent to continue that residence, in Mexico. Her parents arrived at that determination jointly and after reasoned considerations of their living situation in the U.S. and broader concerns like school violence." *Id.* p. 11.

Timmerman, on the other hand, insists the habitual residence of E.L.S. is the United States where she "has spent the substantive majority of her life." Dkt. 27 pp. 9-14. Timmerman asserts both herself and Staggers, "individually and collectively, immersed [E.L.S.] in American culture throughout her life, and intended for the child to be habitually resident in the United States." *Id.* p. 10. Timmerman points to several circumstances which she contends "clearly demonstrate that the United States of America, not Mexico, is the habitual residence of [E.L.S.]." *Id.* pp. 10-12. She maintains the family's "history of frequent, repetitive moves to vastly different locations with [E.L.S.] gave [her] no indication that this particular move [to Mexico] would actually last or that [Staggers] would desire to stay in Mexico for any extended period of time." *Id.* pp. 12-13. According to Timmerman, she never intended to remain in Mexico nor understood Staggers intended to remain in Mexico. *Id.* p. 13.

Upon consideration by this Magistrate Judge, the record submitted during the bench trial falls short of establishing by a preponderance of the evidence that Mexico was the habitual

residence of E.L.S. and therefore was wrongfully removed from Mexico by her mother. E.L.S. was born in the United States, is a United States citizen, and has lived most of her young life in the United States, except from April 2019 to March 2020 when the family lived in Merida, Mexico and from March 2023 to November 2023 while living in Mexico City, Mexico. She is fluent in English and not Spanish. Both her father and mother are United States citizens, and also speak English and not Spanish. All extended family members for E.L.S. from both Staggers and Timmerman are located in the United States, including her grandfather and step-grandmother with whom she currently lives, and has lived with in the past with her mother and father. Staggers has a brother and sister living in the United States, along with a best friend he considers to be a brother, with whom he visits.

Staggers' business which provides the sole income for the family has always been located in the United States even during the times E.L.S. lived in Mexico. Articles of Incorporation for the business and corporate updates are filed in the United States. Staggers travels to the United States for significant periods of time for his business including while E.L.S. was in Mexico City. None of the business clients are in Mexico. All bank accounts and lines of credit have been located in the United States and taxes are paid in the United States. Neither Staggers nor Timmerman applied for or obtained employment in Mexico. Staggers maintains a post office box in the United States, not in Mexico, and uses a United States mailing address for credit cards.

There is a dispute as to whether there was an intention to raise E.L.S. in Mexico. The three-year lease supports Staggers' contention there was an intention to stay in Mexico for at least that period. But the family's living history in frequently moving at the decision of Staggers supports Timmerman's believe they would not remain in Mexico for an extended period. Staggers acknowledges he and Timmerman could be considered "nomads."

Under the totality of the circumstances specific to this case and to the perspective of E.L.S.,

Staggers has not established by a preponderance of the evidence that E.L.S. was "at home" in Mexico as of November 2023 within the meaning of the Hague Convention and ICARA. As such, Staggers has therefore failed to establish E.L.S. was wrongfully removed to or retained in the United States pursuant to the Hague Convention and ICARA.

**B. Acquiescence**

Even if Mexico was determined to be the habitual residence of E.L.S. as of November 2023, the return of E.L.S. to Mexico is not required if Staggers "had consented to or subsequently acquiesced in the removal or retention" of E.L.S. in the United States. Hague Convention Art. 13a. Timmerman must prove Staggers did so by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

As set forth in her brief, Timmerman primarily relies on the Final Protective Order by Consent Agreement issued on November 27, 2023 as evidence Staggers subsequently acquiesced to E.L.S. removal to the United States. Dkt. 27 p. 15. Timmerman emphasizes that Staggers "willingly consented and agreed to" the "legally binding court order" which required E.L.S. to remain in Iowa. *Id.* p. 16. It is also noted the order, as agreed to by Staggers, contains provisions limiting contact with E.L.S. while she is at home and school in Iowa which further shows Staggers' "subsequent acquiescence to the child's retention in the United States." *Id.* pp. 16-17. From Timmerman's perspective, Staggers "had the opportunity to have the case heard on its merits" but instead chose to consent to entry of the order "willingly, consensually and under no legal obligation" thereby agreeing E.L.S. would remain in the United States.

Staggers, on the other hand, insists he "never consented or acquiesced to" the removal of E.L.S. from Mexico. Dkt. 28 p. 3. He emphasizes "'efforts toward reconciliation or visitation with the children do not constitute consent to the children's removal." *Id.* p. 10 (citing *Antunez-Fernandes v. Connors-Fernandes*, 259 F.Supp.2d 800, 813 (N.D. Iowa 2003)). He further

emphasizes "'as a general rule courts should be careful not to translate negotiation into acquiescence. To do so could lead lawyers to refuse to talk or negotiate at all for fear of creating the impression of acquiescence, and could encourage litigation at the expense of a more amiable resolution.'" *Id.* (citing *Antunez-Fernandes*, 259 F.Supp.2d at 814 (citing Linda Silberman, *Hague Convention on International Children Abduction: A Brief Overview and Case Law Analysis*, 28 Fam. L.Q. 9, 26 (1994))).

In addition, Staggers challenges Timmerman's reliance on the Final Protective Order by Consent Agreement to establish acquiescence as "legally specious." *Id.* p. 11. From Staggers' perspective, Timmerman's "primary argument against return boils down to an ineffective 'gotcha' whereby she argues that by entering an agreed order concerning the interim arrangements for the child in what started out as an *ex parte* emergency protective order in the Iowa state matter, [Staggers] essentially surrendered the case before it began." *Id.* pp. 10-11. Staggers maintains "ICARA specifically contemplates implementation of provisional remedies during the pendency of a Hague Convention case." *Id.* p. 11 (citing 22 U.S.C. § 9004).

From Staggers' perspective, Timmerman's "acquiescence argument is entirely meritless both legally and factually." *Id.* p. 13. He emphasizes "[t]he proceedings in the Iowa state court only relate to [Timmerman's] request for a Protective Order against [Staggers] and do not name [E.L.S.] as a protected party." *Id.* And he argues "[t]here are no reasonable facts to suggest that [he] subjectively approved of [Timmerman's] abduction" of E.L.S. *Id.* p. 14. Instead, Staggers notes "he moved expeditiously to bring this petition and immediately seek return of [E.L.S.] . . . and brought custody proceedings in Mexico City – the last place the child has lived continuously in excess of six months." *Id.*

Upon consideration of the record by this Magistrate Judge, Timmerman has sufficiently proven by a preponderance of the evidence that Staggers subsequently acquiesced to the retention

of E.L.S. in the United States. The record unequivocally establishes Staggers knowingly, voluntarily and willingly agreed to the entry of the Final Protective Order by Consent Agreement which explicitly and undisputedly provides: "The Parties' minor child shall remain in the State of Iowa pending further order from a court concerning the ongoing custody dispute." During his trial testimony, Staggers repeatedly acknowledged he knew of and consented to the specific provisions within the order, and indicated his own legal counsel was involved in determining such provisions. Staggers' testimony reveals a subjective intent in acquiescing to E.L.S. remaining in Iowa while custody matters are resolved, commenting: "I knew where she was, and while that's not a lot of level of relief, there's at least a modicum of it."

Given Staggers' acquiescence, the return of E.L.S. to Mexico is not required by the Hague Convention and ICARA.

**C. Grave Risk**

The return of E.L.S. to Mexico is also not required if Timmerman establishes there is a "grave risk" it would expose E.L.S. "'to physical or psychological harm or otherwise place [her] in an intolerable situation.'" *Rodriguez*, 96 F.4th at 1083 (quoting Hague Convention art. 13b). Timmerman "must establish the existence of this narrow exception 'by clear and convincing evidence,' 22 U.S.C. § 9003(e)(2)(A), meaning that [she] must show that a grave risk is 'highly probable,' *see Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)." *Id.* "General evidence of harm is insufficient." *Acosta*, 725 F.3d at 875.

The court "must engage in 'a fact-intensive inquiry' to determine whether [Timmerman] has proved a grave risk of harm, which requires 'careful consideration of several factors, including the nature and frequency of the abuse [and] the likelihood of its recurrence.'" *Rodriguez*, 96 F.4th at 1083 (quoting *Simcox v. Simcox*, 511 F.3d 594, 608 (6th Cir. 2007)). "'The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability

materializes.'" *Acosta*, 725 F.3d at 876 (quoting *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005)).

In support of the assertion there is a grave risk E.L.S. would be exposed to physical or psychological harm upon return to Mexico, Timmerman emphasizes she "underwent severe physical and psychological abuse at the hands of [E.L.S.' father] throughout the course of their relationship including violent, repeated, physical abuse resulting in severe bruising, bleeding and various other injuries to the face and body, some of which some were clearly visible" to E.L.S. Dkt. 27 p. 22. Timmerman points to the photographic evidence of her injuries and notes Staggers "admitted during his sworn deposition testimony to physically assaulting [Timmerman] resulting in severe bruising to the head and facial region on multiple occasions." *Id.* pp. 22-23. Timmerman contends that even beyond those photographs and admissions, she "was also subjected to additional physical attacks by [Staggers]; repeated and harmful verbal and psychological abuse in the presence of [E.L.S.]; and underwent frequent sexual assaults at the hands of [Staggers] during the course of their relationship." *Id.* p. 23.

According to Timmerman, she "fled from [Staggers] to avoid further instances of abuse and to protect [E.L.S.] from the threat of that harm befalling the child either physically or psychologically beyond what it already had." *Id.* pp. 23-24. Timmerman refers to the entry of the Final Protective Order by Consent Agreement as further support and insists E.L.S.' "return to Mexico will have grave psychological, emotional and physical consequences." *Id.* p. 24. It is further argued:

> E.L.S.' living conditions in Mexico without [Timmerman's] presence are unclear and [Staggers] was extremely physically, psychologically, and emotionally abusive to [Timmerman] during the course of the relationship. [Timmerman and E.L.S.] should not be forced by this Court to be exposed said abuse again by means of a Return Order. Further, [E.L.S.] is at grave risk of either witnessing this abuse or experiencing it herself should she be made to return to Mexico with [Staggers] and is at high risk of being returned to an otherwise intolerable situation. [Staggers] has

shown his repeated propensity for violence and inability to control his temper and emotions by exhibiting a pattern of domestic abuse, and [E.L.S.] will be further psychologically harmed by either forcing [Timmerman] to risk returning to Mexico and undergo severe physical and psychological abuse at the hands of [Staggers] to protect [E.L.S.] or being separated from her mother who has been primary caregiver throughout her life as well as her family and entire support system in the United States. The magnitude of the potential harm is so severe in this case that the gravity of risk is simply too grave to order return of [E.L.S.] to Mexico.

*Id.* pp. 24-25.

Staggers however maintains it is error for the Court to factor "'the possible separation of the child from [a parent] in assessing whether the return of the child to [their home country] constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation.'" Dkt. 28 p. 8 (quoting *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (alterations by Staggers)). Staggers suggests "any issues of domestic violence can be fully explored and determined by the Mexican courts upon the child's return." *Id.* From Staggers' perspective, Timmerman's arguments "amount to nothing more than mudslinging by an individual who has abducted [E.L.S.] away from her father and home." *Id.* p. 12. And in his view:

> Timmerman is poorly-positioned to engage in such character assassination. It is far fetched to believe that [E.L.S.] is at graver risk with her father than a mother who has routinely engaged in drug and alcohol use while [E.L.S.] was in her care, woke the child in the middle of the night screaming and yelling at the child and her father had to take her from her room to protect her from her mother and has been found by strangers in a drunken stupor in Mexico in the middle of the night. Or that [E.L.S.] is at a graver risk with her father, when he was hit over the head with a bottle by the child's mother while he was sleeping in bed. Not to mention [Timmerman's] conspiratorial discussions about murdering [Staggers] as a custody remedy with her family, before deciding on international child abduction instead.

*Id.* In addition, Staggers asserts "the fact that such serious allegations of abuse are only now being brought to the Court's attention in the context of this dispute rather than at any time to any authority before the abduction should raise substantial skepticism." *Id.*

Staggers also challenges any reliance on the Final Protective Order by Consent Agreement

to establish grave risk exists in returning E.L.S. to Mexico, noting:

> The court in that matter heard no evidence, made no findings, and did not have jurisdiction to adjudicate any matters before it regarding [E.L.S.] either under Iowa state law, the UCCJEA or ICARA and the Hague Convention.

*Id.* (citing Iowa Code § 598B). In Staggers' view, "[i]t is clear that [Timmerman's] efforts to obtain an order in Iowa were calculated for use in this matter, intended to interfere with [Staggers'] custody rights that he had been exercising in Mexico and designed to ensure that [Staggers] did not take steps to return [E.L.S.] home to Mexico." *Id.* Staggers insists "[t]here is simply no evidence of any abuse of [E.L.S.] by [Staggers], let alone a grave risk of future abuse that Mexican courts could not address." *Id.* p. 13.

Upon consideration of the record by this Magistrate Judge, Timmerman has sufficiently proven by clear and convincing evidence that there is a grave risk the ordered return of E.L.S. to Mexico would expose E.L.S. to physical or psychological harm or otherwise place E.L.S. in an intolerable situation. Timmerman's personal testimony she suffered severe physical and psychological violence by Staggers was credible and supported by unchallenged photographic and other documentary evidence, including Staggers' own words within text messages. *See*, *e.g.*, Ex. 2102. Moreover, Staggers' testimony before the Court further establishes the existence of physical and psychological violence against Timmerman, including the admission he caused bruising, "black eyes", to both her right and left eyes and marks on her chest. Staggers' allegations of violence against him by Timmerman does not diminish or somehow offset his own violent actions. And by Staggers' own admission, such violent behavior extends to physical altercations with other people.

While a dispute exists as to whether Staggers abused E.L.S. directly, there is evidentiary support certain violence against Timmerman occurred in the presence of E.L.S. And according to the Eighth Circuit, although there may be "little evidence that [the father] physically abused [the

child], the lack of such evidence does not necessarily render Article 13b inapplicable." *Acosta*, 725 F.3d at 876 (citing *Baran v. Beaty,* 526 F.3d 1340, 1346 (11th Cir. 2008) (despite the absence of evidence showing that the father abused the child in the past, the father's alcohol abuse, violent temper, abuse of the mother in the child's presence, and threats to hurt the child justified a finding of a grave risk of harm)).

On that point, the testimony of Dr. David Finn wholly supports a determination there is a grave risk that a return of E.L.S. to Mexico by court order would expose E.L.S. to physical or psychological harm or otherwise place E.L.S. in an intolerable situation. Dr. Finn explained there are many adverse effects to a child living with domestic violence in the home. It was further explained it is usually the exception for a victim of domestic violence to report the abuse to family or law enforcement. In Dr. Finn's opinion made to a reasonable degree of forensic psychological certainty, Staggers perpetrated coercive controlling domestic violence against both Timmerman and E.L.S. Dr. Finn further opined there would be a grave risk of harm to E.L.S. if she returned to Mexico. This Magistrate Judge found the testimony and opinions of Dr. Finn to be credible, supported by the overall evidentiary record, and admissible under Federal Rule of Evidence 702. Staggers did not present expert testimony or opinions to refute Dr. Finn.

Because there is a grave risk E.L.S. would be exposed to physical or psychological harm or otherwise place in an intolerable situation, the return of E.L.S. to Mexico is not required by the Hague Convention and ICARA.

## VI. CONCLUSION & RECOMMENDATION

Based on the record presented during the bench trial, Dustin Staggers has not proven by a preponderance of the evidence that Mexico was the habitual residence of E.L.S. prior to the child's removal to the United States in November 2023. Therefore, E.L.S. was not wrongfully removed from Mexico under the Hague Convention and ICARA.

Tori Timmerman, on the other hand, has proven by a preponderance of the evidence that Staggers acquiesced to E.L.S.' retention in the United States. Timmerman has also proven by clear and convincing evidence that there is a grave risk that E.L.S.' return to Mexico would expose E.L.S. to physical or psychological harm or otherwise place E.L.S. in an intolerable situation. Therefore, even if E.L.S. had been wrongfully removed, Timmerman is not required to return E.L.S. to Mexico under the Hague Convention and ICARA.

For those reasons, it is recommended the Amended Verified Petition for Return of Child to Mexico (Dkt. 5) be denied.

Pursuant to Local Rule 72A, a party who objects to a magistrate judge's report and recommendation must file specific, written objections to the report and recommendation within 14 days after service of the report and recommendation. Any response to the objections must be filed within 14 days after service of the objections. A party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections. If a party does not intend to seek review, the party is encouraged to promptly file a statement so indicating.

Dated June 27, 2024.


Stephen B. Jackson, Jr.
Chief U.S. Magistrate Judge